UNITED STATES of America,
Plaintiff,

v.

Charles Duane ARMSBURY,
Defendant.

No. 74–260.

United States District Court,
D. Oregon.

Jan. 12, 1976.

Sidney I. Lezak, U. S. Atty., Kristine Olson Rogers and D. Richard Hammersley, Asst. U. S. Attys., D. Or., Portland, Or., for plaintiff.

Charles Duane Armsbury, pro se.

J. Terrence Bittner and T. Leonard O'Byrne, of Jones, Lang, Klein, Wolf & Smith, Portland, Or., for defendant.

SKOPIL, District Judge:

## INTRODUCTION

An indictment was filed against Charles Duane Armsbury and five other defendants for harboring and concealing an escaped prisoner, Carl Cletus Bowles, in violation of 18 U.S.C. §§ 371, 1072, 2, and 4. Pursuant to the provisions of 28 U.S.C. § 1867(c), defendant, Charles Duane Armsbury, requested that the proceedings be stayed against him. He has filed several motions to dismiss the indictment against him. He alleges that the jury selection procedure used is improper. Evidence was received and affidavits and memoranda were submitted

by both parties. The pertinent issues can be summarized as follows:

## ISSUES

### I.

Provisions of the Jury Selection and Service Act of 1968, 28 U.S.C. § 1861 *et seq.* (hereinafter the Jury Selection Act), are in violation of defendant's constitutional rights.

1. Defendant is denied his right to be judged by his peers, including ex-felons who are presently excluded from jury service under 28 U.S.C. § 1865(b)(5).

2. Defendant is denied his right to a jury comprised of a fair cross section of the community because of the jury qualification based on language, residency, and citizenship under 28 U.S.C. § 1865(b)(1)(2), and (3).

3. Defendant is denied his right to a jury comprised of a fair cross section of the community because of the excuses from jury service given for reasons of undue hardship or extreme inconvenience under 28 U.S.C. § 1863(b)(5).

### II.

Provisions of the District Court Plan for the District of Oregon for Random Jury Selection (hereinafter the District Court Plan) fail to satisfy the requirements of the Jury Selection Act and the Sixth Amendment of the United States Constitution.

4. The exclusive reliance upon voter registration lists results in an underrepresentation of black, Spanish, apathetic, lazy, young, uneducated, disillusioned, selfish, poor, and politically dormant people, as well as people in certain occupational categories, in violation of the Jury Selection Act.

5. The failure to include working guidelines to monitor and remedy existing and developing imbalances in the qualified jury wheel is in violation of the Jury Selection Act.

6. The granting of excuses for women with children under ten is in violation of the Jury Selection Act and defendant's constitutional right to a fair cross section.

## DISCUSSION OF ISSUES

### I.

■ 1. Defendant is afforded important protections under the Sixth Amendment, the relevant portion of which states:

"In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, . . . ."

Defendant claims he was denied the right to an impartial jury. The requirement of an impartial grand jury has been interpreted by the Supreme Court to mean a jury composed of members drawn from a fair cross section of the community. *Thiel v. Southern Pacific Co.,* 328 U.S. 217, 66 S.Ct. 984, 90 L.Ed. 1181 (1946); *Taylor v. Louisiana,* 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975). The Jury Selection Act was enacted to help secure that result.[1] However, defendant claims that by excluding felons from jury service under 28 U.S.C. § 1865(b)(5), he is denied an important segment of the only community that is capable of judging him impartially—his peers.

■ Twelfth-Century England did provide for grand juries composed of neighbors and friends. They were to testify about the validity of rumors in the community concerning the accused. By the Seventeenth Century, however, the function of the grand jury was to scrutinize accusations of the Crown rather than testify in support of its allegations. 1 F. Pollock & F. Maitland, *The History of English Law,* 152 (2nd Ed. 1899). Today the grand jury "has the

---

1. It was thought that the objective approach taken in the Act would eliminate the wide discretion given jury officials under the popular key man system, which allowed for handpicked juries.

1134

dual function of determining if there is probable cause to believe a crime has been committed and of protecting citizens against unfounded criminal prosecutions". *Branzburg v. Hayes,* 408 U.S. 665, 686–687, 92 S.Ct. 2646, 2659, 33 L.Ed.2d 626 (1972).

■ Defendant's construction of the Sixth Amendment is void of judicial or historical support. There is no constitutional right to be tried by members of one's race, *Akins v. Texas,* 325 U.S. 398, 65 S.Ct. 1276, 89 L.Ed. 1692 (1945). Similarly, there is no constitutional right to be tried by one's peers. The Supreme Court in *Taylor v. Louisiana, supra,* 419 U.S. at 538, 95 S.Ct. at 702, stated:

"Defendants are not entitled to a jury of any particular composition."

■ The exclusion of felons from jury service, regardless of their peer status, does not violate the Sixth Amendment. *U. S. v. Arnett,* 342 F.Supp. 1255 (D.Mass.1970). The legislative history indicates that the purpose of this disqualification is to assure probity in the rendering of jury service. H.R. # 1076, 1968 U.S.Code Cong. & Admin.News, Vol. 2, p. 1796. This purpose is surely consistent with assuring a fair trial under the Sixth Amendment, and 28 U.S.C. § 1865(b)(5) serves that purpose.

2. 28 U.S.C. § 1865(b)(1), (2), and (3) disqualifies anyone from jury service who is not a citizen of the United States, who has not resided for a period of one year within the judicial district from which the names were drawn under the provisions of the Act, or who is unable to read, write, understand, or speak the English language. Defendant claims that these exclusions deny him a fair cross section of the community.

■ It is well settled that the one-year residency requirement is constitutional. *United States v. Ross,* 468 F.2d 1213 (9th Cir.), cert. denied, 410 U.S. 989, 93 S.Ct. 1500 (1973); *U. S. v. Gray,* 355 F.Supp. 529 (W.D.Okl.1973). The one-year residency requirement " . . . assures some substantial nexus between a juror and a community whose sense of

justice the jury as a whole is expected to reflect". H.R. # 1076, *supra* at 1796.

■ Likewise, it is not unconstitutional to exclude from jury service those who are not sufficiently proficient in English to understand the proceedings in which they are to participate. *United States v. Valentine,* 288 F.Supp. 957 (D.C.P.R.1968).

■ Finally, the requirement of citizenship is constitutional. It eliminates those who have failed to demonstrate sufficient interest and understanding of our system of government to be charged with the grave responsibility of fairly and impartially judging those who must answer to the laws of that government.

■ Regardless of the constitutionality of these exclusions, defendant has the burden of proving that these exclusions deprive him of a fair cross section. *United States v. Valentine, supra; U. S. v. James,* 453 F.2d 27 (9th Cir. 1971). The defendant has failed to submit evidence in support of his argument. For defendant to sustain his burden of proof, he must present specific facts and figures, not general allegations. *Glasser v. U. S.,* 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942); *United States v. Hyde,* 448 F.2d 815 (5th Cir. 1971), cert. denied, 404 U.S. 1058, 92 S.Ct. 736, 30 L.Ed.2d 745 (1972). Those who do not speak English, who have not lived within the district for one year, or who are not citizens are not themselves cognizable groups entitled to representation in a grand or petit jury.

■ In order to establish a violation of the Sixth Amendment, a defendant must prove a cognizable group was either excluded from or substantially underrepresented in the pool of names from which jurors are drawn. The Supreme Court thus far has recognized race and sex as constitutionally cognizable groups. Lower courts have found other groups cognizable under the statutory provisions of 28 U.S.C. § 1861 *et seq.* The extent to which other groups will be recognized under either the Act or the Constitution is uncertain. The

Act may recognize more groups as cognizable than is constitutionally mandated. It may not recognize less. *Katzenbach v. Morgan,* 384 U.S. 641, 86 S.Ct. 1717, 16 L.Ed.2d 828 (1966).

▬ Groups based solely on language, residency, or citizenship are not cognizable. The burden is on the defendant to establish that the exclusion of a particular group of people results in the exclusion of a cognizable group under the Sixth Amendment. He has not met that burden.

▬ 3. 28 U.S.C. § 1863(b)(5) states that a district court plan may excuse from jury service groups of people or occupational classes for which attendance would be an extreme inconvenience or undue hardship. Defendant claims that this provision denied him a fair cross section of the community.

Defendant has failed to demonstrate how the excuse of certain groups for reasons of hardship has denied him a fair cross section of the community. Even if these excuses do result in the underrepresentation of certain cognizable groups, the statutory authority to grant them is not unconstitutional. Whether exemptions based on excuse are constitutional or not will depend on each excuse. If the excuse reflects a rational accommodation between the community's need for jurors and its need for uninterrupted professional or other important services, then it is constitutional. *United States v. Arnett, supra; United States v. Gray, supra.*

▬ The Supreme Court spoke on this Sixth Amendment issue in a case involving state jury selection:

"The States are free to grant exemptions from jury service to individuals in case of special hardship or incapacity and to those engaged in particular occupations the uninterrupted performance of which is critical to the community's welfare. *Rawlins v. Georgia,* 201 U.S. 638, 26 S.Ct. 560, 50 L.Ed. 899 (1906). It would not appear that such exemptions would pose substantial threats that the remaining pool of jurors would not be representative of the community." *Taylor v. Louisiana, supra,* 419 U.S. at 534, 95 S.Ct. at 700.

If a substantial [2] threat is posed to the representative nature of the jury pool because of constitutionally granted excuses, then supplemental names must be added to correct any gross imbalance.

## II.

4. Defendant claims that the District Court Plan fails to satisfy the policy and express requirements of the Jury Selection Act by relying on the registered voters list to obtain prospective jurors.

The policy of the Jury Selection Act is expressed in 28 U.S.C. § 1861, where it states in part:

"It is the policy of the United States that all litigants in Federal courts entitled to trial by jury shall have the right to grand and petit juries selected at random from a fair cross section of the community in the district or division wherein the court convenes."

All provisions of the Jury Selection Act were carefully drafted in order to effectuate that policy.

The legislative history indicates that "[It is the] aim [of this act] to assure all litigants that potential jurors will be selected at random from a representative cross section of the community and that all qualified citizens will have the opportunity to be considered for jury service." H.R. # 1076, *supra* at p. 1792.

---

2. For a general discussion of what constitutes "substantial" in this context, see the discussion under Section 4.

28 U.S.C. § 1863 sets out the detailed procedures to be followed by the judicial districts in establishing a district court plan that will provide a random selection of jurors from a fair cross section of the community. The first sentence of § 1863 states:

"Each United States district court shall devise and place into operation a written plan for random selection of grand and petit jurors that shall be designed *to achieve the objectives of sections 1861 and 1862* of this title, and that shall otherwise comply with the provisions of this title." (emphasis added)

Section 1863 requires that the District Court Plan use voter registration lists or lists of actual voters as the primary source from which to randomly draw prospective jurors. House Report No. 1076 specifies that voter lists be used as the basic source of names:

" . . . [S]ources of names other than voter lists may be used to *supplement* but not *supplant,* voter lists." H.R. # 1076, *supra* at p. 1794.

However, Section 1863(b)(2) and (3) requires that the District Court Plan prescribe other sources where necessary to insure a fair cross section:

"(b) Among other things, such [district court] plan shall—

"(2) . . . prescribe some other source or sources of names in addition to voter lists where necessary to foster the policy and protect the rights secured by sections 1861 and 1862 of this title. . . .

"(3) specify detailed procedures to be followed by the jury commission or clerk in selecting names from the sources specified in paragraph (2) of this subsection. These procedures shall be designed to ensure the random selection of a fair cross section of the persons residing in the community in the district or division wherein the court convenes. . . . "

■ The District Court Plan for the District of Oregon does not include any source other than voter registration lists. Rather, it is concluded in the Plan that: "Voter registration lists represent a fair cross section of the community in the District of Oregon." *District Court Plan for the District of Oregon for Random Selection of Grand and Petit Juries,* adopted September 23, 1968. Defendant argues that the District Court Plan violates the statutory requirements of § 1863(b)(2) by failing to include other sources and violates the express policy of § 1861 by relying exclusively on a source of names which is not representative of the community in the District of Oregon.

Defendant has misread the requirements of § 1863(b)(2). The mandate of § 1863(b)(2) becomes operative "where necessary" to foster the policy of § 1861. Section 1863(b)(2) does not require that other sources be specified in the original plan itself. It only requires that resort be made to other sources in those communities where voting lists do not represent a fair cross section of the community. It is only when the voting lists become deficient that the statutory requirements of § 1863 require that the lists be supplemented.

■ The express policy of § 1861 has not been violated by the exclusive use of the voter registration list. The following table lists the number and percentage of those cognizable groups relevant to this case as they are represented in the state of Oregon[3] and the qualified

---

**3.** All numbers used have been taken or derived from information provided by the Clerk of the Court, the parties, or from the 1970 General Population Characteristics of Oregon, or from the U. S. Bureau of Census, the 1970 Subject Report on Persons of Spanish Origin, PC2–1C. Since more recent data has not been provided, I shall assume that the relevant population ratios derived from the 1970 figures reflect the population today. The relevant population is not limited to a judicial subdivision of Oregon because grand jurors are drawn from the entire state under Section 10B of the Oregon Plan. The table is limited, however, to that group of the population over 18. Those under 18 are not qualified to serve under 28 U.S.C. § 1865(b)(1).

jury wheel[4] under the District Court Plan.[5]

**4.** The qualified jury wheel is composed of those registered voters who, having been randomly drawn from a voting list, are not exempted from consideration for jury service due to a disqualification or a valid excuse and are therefore qualified prospective jurors. The random selection is executed in the following fashion:

"III. Random Selection from Voter Lists.

"Voter registration lists represent a fair cross section of the community in the District of Oregon. Accordingly, names of grand and petit jurors serving on or after the effective date of the Act shall be selected at random from the voter registration lists of all the counties within the relevant division.

"The Clerk shall make the random selection of names in each division by drawing a proportionate number of names from the voter registration lists in each county:

"A. A sampling interval or number shall be computed by dividing the total voter registration in the division by the number of prospective jurors to be drawn from that divison. Thereafter, a starting number shall be drawn by lot from a group of numbers from one to the number computed as the sampling number.

"B. Commencing with the first precinct in each county in the division, the Clerk shall select as the first prospective juror, the name of the registrant corresponding to the startling number drawn. In sequence thereafter, the Clerk shall select, without regard to precinct, every name corresponding to the number computed as the sampling interval or number until the registration list is exhausted. Where convenient, the Clerk may make the selection by measuring the voter registration cards or by any other appropriate method of approximation.

"C. Where savings in time, money, or convenience can be accomplished using data processing equipment maintained by any public agency or by carrying out the federal jury selection process jointly with other state or federal agencies who use the voter's list for state or municipal jury selection, mailing of voter's pamphlets, or other public purposes the foregoing method of programming the selection of jurors may be changed where necessary to accomplish the savings, if the selection is random and if the change is consistent with the purposes of the Jury Selection and Service Act of 1968. Such changes must be approved by the judge having supervision of the jury selection process.

. . . .

"IX. Qualified Jury Wheels or Boxes.

"The Clerk shall maintain qualified jury wheels or boxes for each division in the District, and shall place in such wheels or boxes, the names of all persons drawn from the master jury wheel or box for the particular division, who have not been found disqualified, exempt, or excused pursuant to this plan. He shall insure that at all times at least 300 names are contained in each such wheel or box.

"X. Assignment to Panels.

"Jurors shall be assigned for service as follows:

. . . .

"B. Grand Jury. Unless the supervising judge orders that a grand jury shall be selected from a particular division, the Clerk shall publicly select a pool of names composed of names drawn from the qualified jury boxes for each division in numbers proportionate to the total voter's registration in the district. The prospective jurors whose names have been drawn shall be summoned for grand jury service in the manner provided in 28 U.S.C. § 1866(b). The supervising judge may, upon individual request, excuse from grand jury service a person who resides more than 100 miles from the place where he has been summoned to serve. The grand jury shall be publicly drawn from the remaining pool of names."

**5.** Certain groups which defendant contends are underrepresented have not been analyzed because they are not cognizable. They are the unemployed, the retired, the student, the uninformed, the politically dormant, the poor, the lazy, the young, the apathetic, the disillusioned, the selfish, and the uneducated.

There are a few cases which have regarded "the poor" as forming a cognizable group. *United States v. Andrews*, 342 F.Supp. 1261 (D.Mass.1972); *United States v. Burkett*, 342 F.Supp. 1264 (D.Mass.1972). However, since economic status is an elusive concept not readily defined by simple tests, as sex or race for example, I conclude that Congress did not intend "the poor" to be included among cognizable groups forming part of the community under § 1861.

The force of precedent also requires that I not regard age groups as cognizable. *U. S. v. Guzman*, 337 F.Supp. 140 (S.D.N.Y.), affirmed 468 F.2d 1245 (2d Cir. 1972); *U. S. v. Briggs*, 366 F.Supp. 1356 (N.D.Fla.1973); *U. S. v. Dellinger*, 472 F.2d 340 (7th Cir. 1972), cert. denied, 410 U.S. 970, 93 S.Ct. 1443, 35 L.Ed.2d 706 (1973); *U. S. v. Cohen*, 275 F.Supp. 724 (D.Md.1967); *U. S. v. Leonetti*, 291 F.Supp. 461 (S.D.N.Y.1968); *U. S. v. Ross, supra.*

RACIAL CATEGORIES[6]

| | No. in State Over 18 | % of St. Pop. Over 18 | No. in Qual. Jury Wheel | % of Qual. Jury Wheel |
|---|---|---|---|---|
| White | 1,357,521 | 97.4 | 2,507 | 92.7 |
| Black | 15,483 | 1.1 | 17 | .6 |
| Spanish | 11,840 | .8 | 4 | .2 |
| Indian | 8,998 | .6 | 13 | .5 |
| Oriental | 4,294 | .3 | 11 | .4 |
| | | | Total | 94.4 |

| | % of Rep. | % of Underrep. | Absolute Diff. in Rep. |
|---|---|---|---|
| White | 95.2 | 4.8 | −4.7 |
| Black | 54.5 | 45.5 | − .5 |
| Spanish | 25.0 | 75.0 | − .6 |
| Indian | 83.3 | 16.7 | − .1 |
| Oriental | 133.3 | 0 | .1 |

OCCUPATIONAL CATEGORIES[7]

| | % of St. Pop. 0/14 | % of Qual. Jury Wheel | % of Rep. in Jury Wheel |
|---|---|---|---|
| White Collar | 50 | 57 | 114.0 |
| Blue Collar | 30 | 32 | 106.6 |
| Farm | 4 | 5 | 125.0 |
| Service | 13 | 7 | 53.8 |

| | % of Underrep. in Jury Wheel | Absolute Diff. in Rep. |
|---|---|---|
| White Collar | 0 | 7.0 |
| Blue Collar | 0 | 2.0 |
| Farm | 0 | 1.0 |
| Service | 46.2 | −6.0 |

28 U.S.C. § 1867(d) states in part:

"If the court determines that there has been a *substantial* failure to comply with the provisions of this title in selecting the grand jury, the court shall stay the proceedings pending the selection of a grand jury in conformity with this title or dismiss the indictment, whichever is appropriate." (emphasis added)

Underrepresentation of the above groups in the qualified jury wheel does not amount to a "substantial" failure of the District Court Plan to comply with the Jury Selection Act. Neither the statute nor legislative history provide much guidance in construing the word "substantial". Its definition has been left up to the courts.[8]

▮ Defendant urges that we examine only the percentages and not the absolute numbers involved. These percentages are represented in my chart under the columns entitled "Percentage of Representation in the Qualified Jury Wheel" and "Percentage of Underrepresentation in the Qualified Jury Wheel". I will not limit the inquiry to simple percentage when examining cognizable groups which themselves constitute only a very small percentage of the total population. To do so would lead to abandonment of voter registration lists as a primary source for qualified jurors, something Congress did not intend. Absolute numbers must be examined. Other courts which have addressed the issue have given a similar construction of the § 1867(d) requirement of substantiality. *United States v. Jenkins*, 496 F.2d 57 (2d Cir. 1974); *United States v. McDaniels*, 370 F.Supp. 298 (E.D.La.1973). If there were ten blacks in the state of Oregon and none appeared on the qualified jury wheel, surely defendant would not argue that because blacks were underrepresented by one hundred percent, he therefore is denied a fair cross section of the community. A fair cross section is made up of people, not percentages. An argument similar to defendant's was made and rejected by the Second Circuit:

"There remains the question of whether the substantiality of the dis-

---

6. These numbers for Spanish, Indian, and Oriental adults are only approximations based on U. S. Census Bureau data.

The total percentage in the qualified jury wheel does not equal 100 because 153 juror questionnaires were not classifiable on the basis of race. See section 5.

7. These numbers and percentages were taken or derived from information provided to the Court by the defendant on November 20, 1975, during oral argument for his motion to dismiss. Taking into consideration the fact·that the state population used here encompasses all workers over fourteen years old while the relevant population encompasses only those over eighteen, these numbers and percentages can only be viewed as approximations. Furthermore, I have serious doubt whether service workers constitute a cognizable group since it is such a nebulous category. I have included it in this chart simply to give the full picture of occupational distributions.

8. "Your committee would leave the definition of 'substantial' to the process of judicial decision." H.R. # 1076, *supra* at 1794.

parity, judged by the 'local community' standard, should be determined by (1) the ratio of the Negro percentage of the adult population to the Negro percentage of those adults available for jury service under the district court's plan or (2) by the difference that would result in the absolute racial composition of the venire as a result of the under-registration of blacks as voters. Appellants contend that the former standard should be used, pointing to the 5 to 3 ratio, which by itself appears substantial indeed. Judge Newman, on the other hand, adopted the latter test, noting that a 6% to 3% disparity between the census figures and the voter registration figures for the community would add to an average array of 50 to 60 veniremen only one (1) additional Negro, which he found not to be substantial enough to deprive appellants of their constitutional or statutory rights. We agree." *U. S. v. Jenkins, supra,* 496 F.2d at 65.

To illustrate the impracticality of relying solely on percentages, one need only look at the underrepresentation figures in the racial category of my chart for black and Spanish people. There one can see that black people are underrepresented 45.5% and Spanish people are underrepresented by 75%. These are extremely large percentages. Yet, had there been no underrepresentation of blacks in the qualified jury wheel for the District of Oregon, there would have been added to a venire of 75 an additional .375 blacks on the average, an increase from .450 to .825 blacks, still less than one black. Had there been no underrepresentation of people of Spanish origin, there would have been added to the venire of 75 an additional .450 Spanish on the average, an increase from .150 to .600 people of Spanish origin, still less than one person.

The only reliable indicia of cross section for a jury pool is the absolute difference in representation that exists between relevant populations—here the adults in the state of Oregon and the people in the qualified jury wheel. These numbers are found in my chart under the column entitled "Absolute Difference in Representation".

I find that the magnitude of actual difference is not "substantial" for any of the cognizable groups used. The only two groups which present any question at all are whites and service workers, assuming the latter were a cognizable group. The negative 4.7 for whites means that of every 100 people in the qualified jury pool, there will be on the average 4.7 fewer white people than there should be. Likewise, the negative 6 for service workers means that for every 100 people in the qualified jury wheel, there will be six fewer service workers than there should be. The fact that juries are composed of twelve people means that there must exist a difference of at least negative 8.3 for a cognizable group before it is likely that the group will be underrepresented on any particular jury.[9] This is not the case here. Even if there did exist a difference of negative 8.3 for any of the cognizable groups, it does not necessarily follow that defendant's right to a fair cross section has been violated. I interpret the word "substantial" to mean something more than negative 8 or 9. How much more is an open question, but trivial deviations will not be recognized.

■ I reject the views of those courts which hold that the use of voter lists cannot deny a fair cross section unless discrimination in voter registration is shown to exist. *U. S. v. Deardorff,* 343 F.Supp. 1033 (S.D.N.Y.1971); *U. S. v. Briggs, supra; U. S. v. Freeman,* 514 F.2d 171 (8th Cir. 1975); *U. S. v. Mathews,* 350 F.Supp. 1103 (D.Del.1972). This interpretation of § 1861 *et seq.* found its

---

**9.** Grand juries must be composed of not less than 16 nor more than 23. Fed.R.Crim.P. 6(a). However, the relevant number for grand jurors is also 12. An indictment by a grand jury may only be found upon the concurrence of 12. Fed.R.Crim.P. 6(f). Petit juries require a unanimous verdict of 12. Fed.R.Crim.P. 31(a).

genesis in the following bit of legislative history:

"In a sense the use of voter lists as the basic source of juror names discriminates against those who have the requisite qualifications for jury service but who do not register or vote. This is not unfair, however, because anyone with minimal qualifications—qualifications that are relevant to jury service—can cause his name to be placed on the list simply by registering or voting. No economic or social characteristics prevent one who wants to be considered for jury service from having his name placed in the pool from which jurors are selected." H.R. # 1076, *supra* at 1794–1795.

From this it was inferred that as long as people are not prevented from registering to vote, voting lists are ipso facto deemed adequate. This interpretation is erroneous.

I believe that § 1861 merely indicates that non-voters do not form a cognizable group. It does not mean that voting lists are always adequate when free from discrimination in voter registration. The voting list is not the end sought but only the means used to ensure that all cognizable groups within the populace are represented on juries. The voting list cannot be adequate if some groups are significantly underrepresented, regardless of the cause.

■■■ I likewise reject the view that one challenging the process of jury selection must prove purposeful discrimination in selecting a qualified jury pool. This, of course, is a tough assignment when attacking a system which randomly selects names. These courts have therefore infused the fiction of presumed discrimination into the system. If the underrepresentation reaches certain levels, the court will presume there was discrimination. *U. S. v. Butera,* 420 F.2d 564 (1st Cir. 1970); *U. S. v. Guzman,* 337 F.Supp. 140 (S.D.N.Y.), affirmed 468 F.2d 1245 (2d Cir. 1972), cert. denied, 410 U.S. 937, 93 S.Ct. 1397, 35 L.Ed.2d 602 (1973).

I will not indulge in such fictions. A defendant is not required by the Constitution to show bad faith discrimination in voter registration or jury selection in order to prevail. *Taylor v. Louisiana, supra; Alexander v. Louisiana,* 405 U.S. 625, 92 S.Ct. 1221, 31 L.Ed.2d 536 (1972); *Theil v. Southern Pacific Co.,* 328 U.S. 217, 66 S.Ct. 984, 90 L.Ed. 1181 (1946); *Glasser v. U. S., supra; Carmical v. Craven,* 457 F.2d 582 (9th Cir. 1971); *Rabinowitz v. U. S.,* 366 F.2d 34 (5th Cir. 1966); *Ford v. Hollowell,* 385 F.Supp. 1392 (N.D.Miss.1974). The very philosophy and purpose of the Sixth Amendment require that I focus on the issue of a fair cross section and not on the issue of discrimination. Likewise, the legislative history of § 1861 *et seq.* does not suggest that a defendant must prove discrimination in voter registration or in jury selection in order to establish a violation under the Act. In fact, express statements indicate the contrary:

"The voting list need not perfectly mirror the percentage structure of the community. But any substantial percentage deviations must be corrected by the use of supplemental sources." H.R. # 1076, *supra* at 1794.

"Jury performance will be enhanced as well by closer approximation of the cross sectional goal under the bill. It must be remembered that the jury is designed not only to understand the case, but also to reflect the community's sense of justice in deciding it. As long as there are significant departures from the cross sectional goal, biased juries are the result—biased in the sense that they reflect a slanted view of the community they are supposed to represent." H.R. # 1076, *supra* at 1797.

". . . in accord with section 1863(b)(2), voter lists will be supplemented by other sources of names if they do not reflect a community cross section." H.R. # 1076, *supra* at 1798.

"moreover, the bill recognizes that in some areas voter lists of all kinds may be insufficient to implement the policies of the act, by reason of local vot-

ing practices. Where that is true, the plan must prescribe other sources to supplement the voter lists." H.R. # 1076, *supra* at 1799.

In response to an argument that discrimination was necessary to establish a violation under the Jury Selection Act, the court in *U. S. v. McDaniels, supra*, stated:

> "[I]t is irrelevant in a Jury Act challenge that the plan has been prepared and implemented in good faith, or that the discrimination, if any, is unintentional. [citations omitted] Nor need the defendant show prejudice; the only question is whether the Act has been complied with. [citations omitted]
>
> "As this court has already observed, 'Whether or not [members of the underrepresented cognizable group] who have not registered, for whatever reason, or indeed without reason, are "at fault" for failing to exercise their franchise is immaterial; the right protected by the statute and called into question here is the right of the defendant to be tried by a fairly constituted jury.'" 370 F.Supp. at 298.

5. It is the defendant's contention that the Clerk of the Court has an affirmative duty to administer the District Court Plan in a way which will effectuate the Jury Selection Act's stated purpose of empaneling juries that are representative of the communities in which they sit. Defendant claims the Clerk of the Court has breached this duty by failing to require that all questionnaires be returned and all questions on race be answered. 28 U.S.C. § 1869(h) states what must be included within the form:

> " 'juror qualification form' shall mean a form prescribed by the Administrative Office of the United States Courts and approved by the Judicial Conference of the United States, which shall elicit the name, address, age, race, occupation, education, length of residence within the judicial dis-

trict, distance from residence to place of holding court, prior jury service, and citizenship of a potential juror, and whether he should be excused or exempted from jury service, has any physical or mental infirmity impairing his capacity to serve as juror, is able to read, write, speak, and understand the English language, has pending against him any charge for the commission of a State or Federal criminal offense punishable by imprisonment for more than one year, or has been convicted in any State or Federal court of record of a crime punishable by imprisonment for more than one year and has not had his civil rights restored by pardon or amnesty. The form shall request, but not require, any other information not inconsistent with the provisions of this title and required by the district court plan in the interests of the sound administration of justice. The form shall also elicit the sworn statement that his responses are true to the best of his knowledge. Notarization shall not be required. The form shall contain words clearly informing the person that the furnishing of any information with respect to his religion, national origin, or economic status is not a prerequisite to his qualification for jury service, that such information need not be furnished if the person finds it objectionable to do so, and that information concerning race is required solely to enforce nondiscrimination in jury selection and has no bearing on an individual's qualification for jury service."

█ With respect to the unreturned questionnaires, it appears that of the original 5,473 questionnaires sent out, 531 were not returned. Of these 531, 269 were not returned by the individual, 237 were returned by the post office undelivered, and 25 were deceased.[10] Under 28 U.S.C. § 1864, the Clerk of the Court has the power to summon those

---

**10.** These numbers were taken from information sent to parties by the Clerk of the Court

on May 28, 1975, pursuant to order entered on May 21, 1975.

**1142**

who fail to return the questionnaire and require them to fill it out. Defendant claims the Clerk violated the Jury Selection Act by failing to do so. It is clear, despite language to the contrary in *U. S. v. Burkett, supra*, that the power to summon under 28 U.S.C. § 1864(a) is discretionary, not mandatory:

"Any person who fails to return a completed juror qualification form as instructed *may* be summoned by the clerk or jury commission forthwith to appear before the clerk or jury commission to fill out a juror qualification form." (emphasis added)

The failure to require return of questionnaires in no way affects the determination of whether a grand jury is drawn from a fair cross section. In order to make that determination, one need only look at how the qualified jury wheel, from which prospective jurors are drawn, compares with the general populace of the community. The names of those who fail to return questionnaires never enter the qualified pool and therefore are of no importance to the defendant.

As for those who failed to answer the question on race, it appears that of the 4,942 questionnaires returned, 503 did not complete the questions relating to race. Of those 503, 350 were not qualified, and the remaining 153 who were qualified were entered in the qualified jury wheel.[11] Defendant claims the Clerk has a responsibility to monitor the system for racial imbalance and to correct any imbalance through the procedures of § 1863(b)(2) and (3). Defendant claims this cannot be accomplished without requiring that all questions on race be answered.

■ The defendant fails to cite any provision of the Jury Selection Act or cases construing the Jury Selection Act which require that those responsible for administering the system must also monitor it and correct cross-sectional deficiencies. I am satisfied that the Clerk

has no such affirmative duty under the Jury Selection Act.

However, 28 U.S.C. § 1864(a), read in conjunction with § 1866(d), 28 U.S.C. § 1867(f), and 28 U.S.C. § 1868, does suggest that the Clerk of the Court has a responsibility to keep records:

28 U.S.C. § 1864(a)

"From time to time as directed by the district court, the clerk or a district judge shall publicly draw at random from the master jury wheel the names of as many persons as may be required for jury service. The clerk or jury commission shall prepare an alphabetical list of the names drawn, which list shall not be disclosed to any person except pursuant to the district court plan and to sections 1867 and 1868 of this title. The clerk or jury commission shall mail to every person whose name is drawn from the master wheel a juror qualification form accompanied by instructions to fill out and return the form, duly signed and sworn, to the clerk or jury commission by mail within ten days. If the person is unable to fill out the form, another shall do it for him, and shall indicate that he has done so and the reason therefor. In any case in which it appears that there is an omission, ambiguity, or error in a form, the clerk or jury commission shall return the form with instructions to the person to make such additions or corrections as may be necessary and to return the form to the clerk or jury commission within ten days. . . ."

28 U.S.C. § 1866(d)

"Whenever a person is disqualified, excused, exempt, or excluded from jury service, the jury commission or clerk shall note in the space provided on his juror qualification form or on the juror's card drawn from the qualified jury wheel the specific reason therefor."

28 U.S.C. § 1867(f)

---

11. These numbers were taken from information sent to parties by the Clerk of the Court

on June 9, 1975, pursuant to order entered on June 9, 1975.

"The contents of records or papers used by the jury commission or clerk in connection with the jury selection process shall not be disclosed, except pursuant to the district court plan or as may be necessary in the preparation or presentation of a motion under subsection (a), (b), or (c) of this section, until after the master jury wheel has been emptied and refilled pursuant to section 1863(b)(4) of this title and all persons selected to serve as jurors before the master wheel was emptied have completed such service. The parties in a case shall be allowed to inspect, reproduce, and copy such records or papers at all reasonable times during the preparation and pendency of such a motion. Any person who discloses the contents of any record or paper in violation of this subsection may be fined not more than $1,000 or imprisoned not more than one year, or both."

28 U.S.C. § 1868

"After the master jury wheel is emptied and refilled pursuant to section 1863(b)(4) of this title, and after all persons selected to serve as jurors before the master wheel was emptied have completed such service, all records and papers compiled and maintained by the jury commission or clerk before the master wheel was emptied shall be preserved in the custody of the clerk for four years or for such longer period as may be ordered by a court, and shall be available for public inspection of the purpose of determining the validity of the selection of any jury."

This enables defendants to challenge the system when it produces a qualified jury wheel which substantially underrepresents cognizable groups in the community.

 Completely accurate records were not kept in this case. But this breach of duty does not amount to a "substantial failure" to comply with the provisions of the Jury Selection Act within the meaning of § 1867(d). Defendant contends that he is precluded from a meaningful examination and challenge to the system if accurate records are not kept. In some cases this may be true. Here only 153 of the 2,705 in the qualified jury pool had failed to answer the questions on race.[12] Although the defendant need not prove prejudice to establish a violation of the Jury Selection Act, he must prove a substantial noncompliance with its provisions.

"A committee amendment to S. 989 eliminates the need to prove prejudice as a condition of judicial intervention when substantial noncompliance with the act is established. The committee believes that the 'prejudice' requirement would unduly burden the procedure established by the bill for challenging noncompliance. Moreover, such burden goes beyond what has been required to sustain a constitutional challenge. See, e. g., *Thiel v. Southern Pacific Co.*, 328 U.S. 217, 225, 66 S.Ct. 984, 90 L.Ed. 1181." H.R. # 1076, *supra* at p. 1806.

The inclusion of those 153 not classifiable on the basis of race within the qualified jury wheel amounts to "harmless error", not "substantial failure". Not every failure to comply with the provisions of the Jury Selection Act will constitute a "substantial" failure.

"The bill does not guarantee that each venire or each jury will mirror the structure of the community. It guarantees only that appropriate selection procedures have been used. Moreover, challenges will lie only for substantial failure to comply with the statutory provisions. There is room for a doctrine of harmless error. For example, if the local plan should call for 2,000 names to be placed initially in the master wheel and only 1,990 names were used, the reviewing court could find such a departure harmless. The combination of specificity and the sub-

---

**12.** These numbers were taken from information sent to parties by the Clerk of the Court on June 9, 1975, pursuant to order entered on June 9, 1975.

stantial failure to comply feature will mean that judges will have readily available standards against which they can measure the procedures actually used." H.R. # 1076, *supra* at p. 1805.

Furthermore, the number of questionnaires not completely answered is not the test of substantiality in this context. Certain questions in the questionnaire are more important than others. If those sent questionnaires fail to indicate whether they speak English or could understand the proceedings in which they were to participate, then "substantially" may be less difficult to establish. *U. S. v. Okiyama*, 521 F.2d 601, No. 75–1429 (9th Cir. 1975).

6. Under the District Court Plan, excuses are granted upon individual request for women who have the legal custody of a child or children under ten years old:

"The District Court finds that jury service by members of the following occupational classes or groups of persons will entail undue hardship or extreme inconvenience, and the excuse of such members will not be inconsistent with the Act, and may be granted upon individual request:

. . . . .

"C. Women who have legal custody of a child or children under the age of 10 years."

■ Defendant claims this provision denies him both his rights under the Jury Selection Act and his rights to a fair cross section under the Sixth Amendment.

Defendant's statutory claim does not hold water. The District Court Plan clearly contemplates that women with small children may be excused upon request from jury service. *U. S. v. Eskew*, 460 F.2d 1028 (9th Cir. 1972); *United States v. Grey, supra; U. S. v. Briggs*, 366 F.Supp. 1356 (N.D.Fla.1973). 28 U.S.C. § 1863(b)(5) directs the District Court Plan specify those groups of people whose members shall, upon individual request, be excused from jury service. In the House Judiciary Committee Report

the following language, explanatory of 28 U.S.C. § 1863(b)(5), appears:

"Local flexibility is the theme of subsections (b)(5) and (6) as well. Subsection (b)(5) permits each plan to identify occupational or other groups of persons whose members may request excuse from service. There must be a finding that service by such a group would entail 'undue hardship or extreme inconvenience to the members thereof,' and that excuse upon individual request would not be inconsistent with the basic policies of the bill. Such groups might include, among others, doctors, ministers, sole proprietors of businesses, and mothers with young children. Members of excused groups could serve if they desired to do so, but a request for an excuse must be granted. For example, a mother with young children might prefer to hire a babysitter in order to be free for jury duty, but if she chooses not to hire one her request for an excuse must be granted." H.R. # 1076, *supra* at p. 1800.

■ Defendant also claims that his constitutional right to a fair cross section has been denied by this exemption. The government, reversing its earlier position on this issue, now agrees that the exemption is unconstitutional, but for reasons of the Fifth Amendment and not the Sixth Amendment. The government asks this court to find this provision unconstitutional. The government claims, however, that this provision has not denied defendant a fair cross section and therefore the indictment should not be dismissed. I do not reach this Fifth Amendment issue because I don't believe defendant has standing to assert what is essentially an equal-protection claim on behalf of jurors. *Taylor v. Louisiana, supra,* is not to the contrary. Taylor's argument centered around the fact that the automatic exclusion of women from jury service denied him a fair cross section:

"The State first insists that Taylor, a male, has no standing to object to the exclusion of women from his jury.

But Taylor's claim is that he was constitutionally entitled to a jury drawn from a venire constituting a fair cross section of the community and that the jury that tried him was not such a jury by reason of the exclusion of women." 419 U.S. at 526, 95 S.Ct. at 695.

As for defendant's cross section claim, it is well settled that defendant need not be a member of the excluded group in order to raise this Sixth Amendment issue. *Peters v. Kiff*, 407 U.S. 493, 92 S.Ct. 2163, 33 L.Ed.2d 83 (1972); *Taylor v. Louisiana, supra.* However, in order to establish a Sixth Amendment violation, defendant must show that the excuse granted women with children results in a substantial underrepresentation of women. Defendant always has this burden of proof. *U. S. v. James*, 453 F.2d 27 (9th Cir. 1971); *U. S. v. Hyde*, 448 F.2d 815 (5th Cir. 1971). In *Taylor v. Louisiana, supra*, the evidence was overwhelming. There were no females on a venire of 175 people. The Court said:

> "Accepting as we do, however, the view that the Sixth Amendment affords the defendant in a criminal trial the opportunity to have the jury drawn from venires representative of the community, we think it is no longer tenable to hold that women as a class may be excluded or given automatic exemptions based solely on sex *if* the consequence is that criminal jury venires are almost totally male. . . ." (emphasis added) 419 U.S. at 537, 95 S.Ct. at 901.

Here defendant has failed to prove that this exemption has denied him a fair cross section. The only evidence offered by the defendant suggests that women are overrepresented in the pool of jurors. In other words, there is a greater percentage of women in the pool of jurors than in the population of the state as a whole—52.1% versus 51.9%.

## CONCLUSION

The provisions of the Jury Selection Act examined in this opinion are constitutional. They do not violate any of defendant's constitutional rights.

The provisions of the District Court Plan examined in this opinion comply with the requirements of the Jury Selection Act and the Sixth Amendment of the United States Constitution.

The failure in this case to require that each questionnaire be returned fully answered and that perfectly accurate records be kept is not in substantial noncompliance with the provisions of the Jury Selection Act.

The remaining issues raised by the defendant are without merit.

An order will be entered denying each of defendant's motions to dismiss the indictment against him.