**UNITED STATES of America, Plaintiff,**

v.

**Henry William TARNOWSKI, Defendant.**

**Crim. A. No. 6–81003.**

United States District Court,
E. D. Michigan, S. D.

March 17, 1977.

Philip Van Dam, U. S. Atty., by Gordon S. Gold, Asst. U. S. Atty., Detroit, Mich., for plaintiff.

Kenneth R. Sasse, Detroit, Mich., for defendant.

## OPINION

FEIKENS, District Judge.

Defendant Henry W. Tarnowski was indicted by two grand juries in this Federal District. The grand juries which indicted him were impaneled on September 29, 1976. On October 28, 1976, one grand jury presented its indictment against him in Criminal Case No. 6–81003, charging him with possession of goods stolen from interstate shipments (suntan oil and toy dinosaurs). On December 21, 1976, the other grand jury presented its indictment against him in Criminal Case No. 6–81608, charging him with possession of goods stolen from an interstate shipment (frozen shrimp). The first case (Cr.No. 6–81003) was assigned to this judge, and the second case (Cr.No. 6–81608) was assigned to Judge Robert E. DeMascio. Under a local court rule, which requires that companion cases be assigned to the judge having the lower case number, that case (Cr.No. 6–81608) was assigned to this court. In both indictments Kenneth B. Kush was also named as a defendant.

On December 29, 1976, these indictments led to Defendant Tarnowski's arrest in California. On February 4, 1977, Kenneth R. Sasse, an attorney on the staff of the Office of the Federal Defender, was appointed to represent him in Criminal Case No. 6–81608 (the frozen shrimp case). Tarnowski was arraigned on both that case and on Criminal Case No. 6–81003 (the suntan oil—toy dinosaur case) on February 11, and Kenneth R. Sasse was also appointed on February 11 to represent him in Criminal Case No. 6–81003.

On February 17, 1977, Defendant Tarnowski filed a motion to dismiss the indictment issued against him in Criminal Case No. 6–81608 (the frozen shrimp case) by challenging the indictment on the ground that the grand jury which had indicted him had not been selected in accordance with a Plan of the United States District Court for the Eastern District of Michigan, for the Random Selection of Grand and Petit Jurors.[1]

Section 1867 of Title 28, the Jury Selection and Service Act of 1968, as amended, provides in subsection (a):

"In criminal cases . . . within seven days after the defendant discovered or could have discovered by the exercise of diligence, the grounds therefor, whichever is earlier, the defendant may move to dismiss the indictment . . . on the ground of substantial failure to comply with the provisions of this title in selecting the grand jury or petit jury."

Even though it was contended that Kenneth R. Sasse was appointed as Defendant Tarnowski's counsel in Criminal Case No. 6–81608 on February 4 and that Sasse then knew or should have known the grounds for the bringing of such a motion to dismiss, the Court nonetheless found that the motion in Criminal Case No. 6–81003 was timely filed in that Sasse had not been appointed counsel in that case for defendant until February 11, and the motion to dismiss was filed six days thereafter.

Pursuant to the Jury Selection and Service Act of 1968 (28 U.S.C. § 1861, *et seq.*), the Judges of the Eastern District of Michigan adopted a plan and filed it as approved on October 19, 1973. That Plan required in Section (4.4) that,

"Master jury wheels will be emptied and refilled every two years in conformance with this plan as new voter registration information becomes available or at more frequent intervals as deemed necessary

---

1. No such motion was filed by Defendant Tarnowski as to Criminal Case No. 6–81608 probably for the reason that it would not have been

timely filed. Defendant Kenneth Kush did not file such motion.

by the Clerk of the Court under the auspices of the Chief Judge."

The Master Jury Wheel, which was filled in July, 1973, was not emptied and refilled within two years of October 19, 1973. It was not emptied and refilled until January 12, 1977.

Accordingly, Defendant Tarnowski contends that he was indicted by a grand jury which had been selected from a master jury wheel which had not been emptied and refilled as required by the plan. He argues that since the master jury wheel had not been emptied and refilled as required by the plan, the grand jury which indicted him did not represent a fair cross section of voters in the Eastern District of Michigan, Southern Division, and, specifically, that there thus tended to be excluded from the grand jury young people who were between eighteen and nineteen years of age.

Testimony that has been taken in similar cases and motions [2] before Judge Robert E. DeMascio (*U. S. v. Black, U. S. v. Coleman,* and *U. S. v. Foster,* D.C., 429 F.Supp. 792, motions have not yet been decided) was introduced by stipulation of the parties into the record in this case. From that testimony it appeared that the Clerk of this Court had not followed the requirement of the plan by not emptying and refilling the master jury wheel by October of 1975. Hence, the defendant contends that since this salient requirement of the plan had been disregarded by the Clerk, there was and is substantial failure to comply with the plan.

When it became known to the judges of this court that the master jury wheel had not been emptied and refilled within two years of October, 1973, the judges amended Section 4.4 of the October 19, 1973 Plan to provide as follows:

"Master jury wheels will be emptied and refilled every *four* years in conformance with this plan as new voter registration

information becomes available or at more frequent intervals . . . ."

This amendment was approved by the panel consisting of the Judicial Council of the United States Court of Appeals for the Sixth Circuit and the Chief Judge of this court, effective December 8, 1976.

In order to determine what the basic purposes of the Jury Selection and Service Act are, how district plans for random selection of jurors relate to the Act, and whether there is substantial compliance with the Act and the plan, it is necessary to examine the background and legislative history of the Act.

The Jury Selection and Service Act of 1968 came into being through the cooperative effort of committees of the Judicial Conference of the United States and the Congress. The purpose of and reason for the Jury Selection and Service Act are fully documented in both the legislative history and the Minutes of the Committee of the Judicial Conference on the Operation of the Jury System. Because of the important work that this latter committee undertook in drafting under the leadership of its chairman, Judge Irving R. Kaufman of the Court of Appeals for the Second Circuit, the committee report accompanying the draft became known as the Kaufman Committee Report. Judge Kaufman also testified before the Congress. That report, which is referred to in part in *U. S. v. Blair,* 470 F.2d 331, 335 (5th Cir. 1972), is fully set forth in a booklet entitled "The Works of the Committee on the Operation of the Jury System of the Judicial Conference of the United States, 1966–1973," published by West Publishing Company.

The Kaufman Committee Report, released in 1966, expresses evident dissatisfaction with the widespread use of the "keyman" [3] system under which federal jurors were being selected. The criticism of the

---

**2.** There are similar matters pending before Judge Kennedy and Judge Pratt.

**3.** "Key-man" refers to a system by which jury commissioners selected names of people who

they believed were qualified for jury duty. It was relatively easy to supplement these lists by suggestion to the commission of names of people who wanted to be on juries.

"key-man" system, which was country-wide, included the Eastern District of Michigan. The preface to the report reveals that efforts to change the selection method began in 1941 when Chief Justice Stone appointed a committee of five judges to make a study of the manner of selecting jurors in the federal courts. Later in the Civil Rights Act of 1957, Congress established independent federal qualifications for jury service. Continued dissatisfaction with the "key-man" system stemmed largely from the accepted criticism that the selection system was vulnerable to charges of discrimination against minorities and racial imbalance. Frequently the criticism pointed out that the "key-man" system did not select juries from a fair cross section of the people in a judicial district. As a result the Kaufman Committee, working closely with congressional committees, drafted the landmark law—the Jury Selection and Service Act of 1968.

It is clear that these committees, from the first, sought legislation to end "key-man" jury selection discrimination. They undertook to do this by proposing a requirement of random selection of jurors from voter registration lists prepared in national or statewide elections. The committees concluded that this was a desirable and necessary reform because the "key-man" system allowed opportunities for unintentional as well as intentional discrimination. They found that even though jury commissioners or "key-men" did not deliberately intend to discriminate, they were not acquainted with many citizens in the minority or low income population groups, and so these individuals were not afforded an opportunity to serve as jurors. Perhaps more importantly, the haphazard nature of the process did not insure that each qualified citizen would have an opportunity equal to that of every other qualified citizen to be considered for jury service.[4]

The draft of the bill also provided for jury selection plans in each of the federal judicial districts; such plans were required to comply with the provisions of the Act and had to be approved by the judicial council of each circuit. It appears that the Kaufman Committee desired to suggest some diversity; that is, in addition to the use of voter registration lists, a plan could permit choices to meet varying local practices and conditions in jury selection.[5]

It is noteworthy that a study of the Kaufman Committee Report and the legislative history reveals no significant discussion of the time periods by which the master jury wheels had to be refilled. Indeed the statute, as enacted, simply provided for refilling "from time to time." It may well be that this was of no real concern to the committee in that "key-man" jury selection had provided a rather continuous input of jurors and the "key-man" lists were constantly being supplemented by the jury commissioners.

The legislative history as to the purpose of the Act is likewise interesting and illuminating.[6] House Report No. 1076 states:

"The purpose of S. 989, as amended, is to provide improved judicial machinery for the selection, without discrimination, of Federal grand and petit juries. Its aim is to assure all litigants that potential jurors will be selected at random from a representative cross section of the community and that all qualified citizens will have the opportunity to be considered for jury service."

*U.S.Code Cong. & Admin.News*, 1968, 90th Cong., 2d Session, p. 1792.

In the general statement, at page 1793, the legislative history reveals that S. 989, as amended, would impose a measure of uniformity upon federal jury selection *without disturbing local flexibility*. There is a reference to the two important principles which guided the committees: (1) random

---

4. See *The Jury System in the Federal Courts* —"Works of the Committee on the Operation of the Jury System of the Judicial Conference of the United States," pp. 18, 19, West Publishing Company.

5. See "Works of the Committee . . .", *supra* at 21.

6. See *U.S.Code Cong. & Admin.News*, 1968, 90th Cong., 2d Session, p. 1792, *et seq.*

selection of juror names at a minimum had to be from the voter registration lists of the district or division in which the court is held, and (2) determination of juror disqualifications, excuses, exemptions, and exclusions had to be on the basis of objective criteria only. It is clear that the legislative intent to use random selection of jurors from voter registration lists would eliminate two basic complaints—that some citizens complained about the frequency with which they had been called for jury service, while others equally qualified were called infrequently or not at all. It is also clear that the Congress intended that voter registration lists should be supplemented by other sources whenever the voter registration lists did not adequately reflect a cross section of the community. The voter registration list requirement, together with the provision for supplementation, was thus the primary technique for implementing the cross sectional goal of this legislation.

Title 28, Section 1863, contains the guidelines for a plan adopted pursuant to the Act. There are nine specifications which a plan must provide. In discussing Section 1863, the legislative history reveals that it was the congressional intent that each judicial district or division adopt a plan which "must be consistent with the policy objectives of the bill and also must contain a variety of provisions specified in this section." *U.S.Code Cong. & Admin.News, supra* at 1798. The history continues at page 1799:

"Although the plan adopted in each locality is subject to a number of requirements, the plan approach is designed to provide a significant measure of flexibility so that localities may adjust the administration of jury selection to their particular needs."

In subsection (b)(2) of section 1863, the statute as enacted, provides that the names of prospective jurors shall be selected from either the voter registration lists or the list of actual voters, and the committee comment as to this says at page 1799: "These alternatives are offered because the pre-ferred source, the registration lists, may not be up-to-date in some areas."

A key section, Title 28, Section 1863(b)(4), provides in part that, "The plan shall provide for periodic emptying and refilling of the master jury wheel at specified times, the interval for which shall not exceed four years." The four-year specification was added by amendment in 1972 (Public Law 92–269). The statutory text prior to the amendment required periodic emptying and filling of the wheel at such times as each plan shall specify. In a footnote in *U. S. v. Blair, supra* at 336, that court refers to the Kaufman Committee Report regarding the time requirement. In addressing a question as to the need for a master jury wheel, the committee said,

"*Thus once the names are selected for the master wheel, the voter lists need not be resorted to again until it is time to empty the wheel as provided for in § 1863(b)(4). In most cases, this will be once every four years.*" (emphasis added in text)

Section 1867 establishes the procedure for challenging compliance. The legislative history at page 1805 says ". . . challenges will lie only for substantial failure to comply *with the statutory provisions.*" (emphasis added) Subsection (d) states in part:

"If the court determines that there has been a substantial failure to comply with the *provisions of this title* in selecting the grand jury, the court shall stay the proceedings pending the selection of a grand jury in *conformity with this title* or dismiss the indictment, whichever is appropriate." (emphasis added)

In subsection (e), the statute reads:

"The procedures prescribed by this section shall be the exclusive means by which a person accused of a Federal crime . . . may challenge any jury on the ground that such jury was not selected *in conformity with the provisions of this title.*" (emphasis added)

The legislative history contains this comment at page 1806:

"Subsection (e) makes clear that the procedures prescribed in this section are the

exclusive means for challenging compliance with the statute."

From the legislative history, the Judicial Conference Committee Report (the Kaufman Report), the statute and its amendment there clearly emerges the purpose of the statute, the relation of the statute to a district plan and methods of challenging compliance with the statute. Since there was widespread criticism of "key-man" jury selection methods, what was desired was the establishment of a list which reflected a cross section of people (registered voters) within a district from which grand and petit juries could be chosen through random selection. It is equally clear that a judicial district could adopt a local plan which met the statutory requirements and that such plan could provide additional methods for random selection of jurors which would be approved if its purposes were consonant with the statute. Finally, what is also clear is that challenges to such plans could be successfully maintained if a given plan was not framed in accordance with the statutory purpose.

Defendant in this case raises one basic complaint—he contends that the Clerk of this Court deliberately failed to empty and refill the master jury wheel. Defendant says that this deliberate failure on the part of the Clerk, which conduct he characterizes as nonfeasance, was a substantial failure to *comply with the plan.* (emphasis added)

Defendant does not raise a constitutional challenge. He recognizes that the young people who he claims have been excluded from the voter registration lists from which these grand juries were selected are not a cognizable class. Defendant says that there is conduct here not of constitutional dimension but which must nonetheless be condemned.

■ In making this argument defendant says that he need not show prejudice, and with this the Court agrees. But, because defendant need not show prejudice does not mean that he has automatically demonstrated substantial failure. *U. S. v. Blair,*

*supra,* is instructive. In that case it was contended that the failure of the district clerk to supplement the master jury wheel with names randomly selected from among persons who registered to vote subsequent to the initial filling of the master jury wheel violated the plan of the United States District Court for the Southern District of Florida. It was claimed that this failure disenfranchised certain persons, who were twenty-one and twenty-two year olds, from the statutory right to serve on juries and that this denied the defendant's right to be indicted and tried by a jury fairly representative of the community. Even though *U. S. v. Blair* was decided in June, 1972, and prior to the amendment of Section 1863(b)(4),[7] the court found that Congress necessarily contemplated that, for a substantial period of time, the master wheel would be static. This meant that during this period persons becoming potentially eligible for jury service would be excluded. The court said:

"[I]t is a part of the Court's (and Reviewing Panel's) determination as mandated by the Act (§ 1863(a)) that the Plan is 'designed to' and will 'achieve the objectives of sections 1861 and 1862' for random selection of jurors from a fair cross section, equal opportunity for jury service and avoidance of discrimination by reason of race, color, sex, religion, national origin or economic status.

"Behind this was, of course, the congressional determination that goals could best be attained through the use of voter lists (§ 1869(c), (d)).

"Only where necessary to 'foster the policy and protect the rights secured by Sections 1861 and 1862 . . .' § 1863(b)(2) are other sources of names to be used. This is the supplementing spoken of."

*U. S. v. Blair, supra* at 336, 337.

■ *U. S. v. Blair* illustrates that, in determining whether or not there is substantial failure, the purpose and objectives of *the Act* must be analyzed—that the plan must be considered in the light of the act

---

**7.** which now requires an emptying and a refilling of the wheel every four years.

and that the question cannot simply be: Is there a substantial failure to comply with *the plan?*

To the same effect, *see U. S. v. Davis,* 546 F.2d 583 (1977). Although dealing with a different type of non-compliance with a plan, that case involved an employee of the General Services Administration who had a key role as the operator of the computer in the jury selection process. This was pursuant to the approved plan. The names in the qualified wheel were delivered to a General Services Administration computer specialist who was designated as a representative and officer of the court to introduce these names into the computer system. The Jury Selection and Service Act, 28 U.S.C. 1861, *et. seq.,* requires that the clerk manage the jury selection process and that the drawings from the qualified wheel be made "publicly"; this also was not done. After noting that the exclusive ground for challenging jury selection procedure under the statute is substantial failure to comply with the Act, the Court of Appeals for the Fifth Circuit stated:

> "Determining the substantial compliance question requires that the alleged violations of the Act be weighed against the goals of the statute. . . . There is no evidence that this shortcoming 'operate[d]' to frustrate the goals of the Act."

*See supra* at 589.

It is also necessary to analyze the plan adopted by this court on October 19, 1973. It states to what divisions of the court it is applicable; that the clerk would manage the jury selection process under the supervision and control of chief or presiding judge of the district; that voter registration lists would be the sources of prospective jurors; that such lists, if possible, be placed on computer cards; that a master jury wheel be maintained for each division; that names be drawn from the master jury wheel in a public drawing; that certain persons could be excused from jury duty where exempt; that the qualifications, excuses, exemptions, and exclusions from jury duty would be determined by the chief judge or by any presiding judge; that there

be an assignment of jurors from the qualified jury wheel to panels and that the length of service of each juror be stated. Of primary interest here is that the plan also required that the master jury wheel be emptied and refilled every *two years.*

It is evident that the plan borrows heavily from the statute and is completely in accord with the statute, except as to the plan's imposition of a more stringent time requirement.

From all this, one basic question emerges. Is the recognized failure to empty and refill the master jury wheel a substantial failure to comply with the provisions of the statute?

The reported cases are of some assistance. In *U. S. v. Okiyama,* 521 F.2d 601 (9th Cir. 1975), the court found that persons who were selected to serve as jurors did not understand the English language and so could not understand the proceedings in which they were to participate; also, that they did not represent a fair cross section of the community. This, the court concluded, demonstrated that the procedures employed in selecting the grand jury were not in substantial compliance with Title 28, Sections 1862, *et seq.*

*U. S. v. Blair, supra* at 337, holds that the structure of the plan must achieve the objectives of the statute. The court said:

> "[T]he whole Plan declares that voter registration lists are a completely adequate source for random selection . . . the Plan determines that the policy, purpose and intent of the Act will be fully accomplished by the use of such voter registration lists."

In *U. S. v. Ross,* 468 F.2d 1213 (9th Cir. 1972), the complaint was that the jury commissioner violated the Jury Selection and Service Act of 1968 by refilling the master jury wheel with names taken from voter lists other than those for the most recent state or federal general elections. The court held that use of a non-conforming list probably resulted in a larger pool of potential jurors than if the counties involved had provided lists of persons who had actually voted in the 1968 general election. The

court said, at page 1219: "This is certainly consistent with the policies of the Act." The court then went on to hold that the departure in this case from the literal requirements of Section 1869(c) was the type of harmless error that did not require a reversal of the criminal conviction.

In *U. S. v. Gurney*, 393 F.Supp. 688 (U.S. D.C., M.D.Fla.1974), the court held that the lack of any requirement for absolute uniformity among plans (of divisions of the district) mandates that an attack on a plan on the grounds of statutory non-compliance must be considered in the light of the objectives of the Act, the population and size of the district, and the size of the master jury wheel requirements. In the case, it was claimed that the plan failed to set a standard to be used by the clerk in determining pro rata selection of jurors between divisions in the court; that the plan failed to contain distance limitations as to the length of travel of each juror; that the clerk made modifications in the plan that had not been reviewed and approved by the panel; and, that the clerk and the court did not literally follow the requirements of the plan. In determining whether or not these charges constituted "substantial failure to comply with the provisions of the title" as required by Section 1867(a), the court turned to the policy and purpose of the Congress in passing the Act. Having concluded that the basic policy of the Act was to secure the selection of grand and petit juries from a fair cross section of the district and that all citizens should have the opportunity to be considered for service on such juries and that no citizen should be excluded from service by reason of any discriminatory act on account of race, color, religion, sex, national origin or economic status, the court, having examined each of the charges, found they did not demonstrate substantial failure to comply with the provisions of the Act.

In *U. S. v. Geelan*, 509 F.2d 737 (8th Cir. 1974), it was held that a failure to include certain eighteen to twenty-year-olds on the jury rolls did not amount to a systematic exclusion of potential jurors and an error of constitutional dimensions.

In *U. S. v. Armsbury*, 408 F.Supp. 1130 (U.S.D.C.D.Or.1976), the court held that a district court plan which authorized the exclusion of ex-felons from the jury wheel, which excluded persons who were not residents of the district for one year, and persons who could not understand English, and provided that women with young children could be excused from jury service upon request, did not violate any of the provisions of the Jury Selection and Service Act of 1968, as amended.

■ From these cases, it appears that what is preeminent in jury selection is that there be a fair cross section of persons in the district from which the jury selection is made. It is that purpose and objective with which there must be compliance. There is no special significance to be given to a plan adopted pursuant to the Act. The plan may allow for local flexibility, but, in any event, the plan must mirror the Act. It is thus clear from these cases that substantial failure must be substantial failure to comply with the provisions of the Act.

■ The adoption by this court of the district court plan which had the requirement that the master jury wheel be filled every two years instead of every four years does not make the plan the Act. The plan can only be considered as a supplement to the Act. It does not replace it.

The basic question is whether or not the procedural purpose of the plan, namely, the requirement of a fair cross section of citizens whose names are to be placed on lists from which the master jury wheel is to be fashioned, is consonant with the purpose of the Act. The Court concludes that it is. Defendant cannot show that the basic purposes of the Act have been subverted. What defendant says is that the master jury wheel should have been emptied and refilled every two years as required by the plan, but defendant does not demonstrate that there has been a failure on the part of the clerk to provide a fair cross section of registered voters into the master jury wheel. While it may be true that because the master jury wheel was not emptied and refilled by October, 1975, certain young peo-

ple were excluded (in the event that they had registered to vote) from the lists from which grand and petit jurors would be selected, that exclusion neither has constitutional dimensions, nor is it a substantial failure to comply with the provisions and purposes of the Act.

Time is not of the essence of the Act. Indeed, the jury selection input of the "key-man" or "suggestor" method usually was continuous and current. The fact that it was current did not eliminate potential discrimination, for there was in that method of jury selection, regardless of its requirements, the discrimination which the Jury Selection and Service Act sought to eliminate—discrimination which might be caused by a process of selecting jurors who did not represent a fair cross section of people in the district.

This must be the focus of the plan. Substantial failure to comply with the provisions of the Act must be failure to provide a fair cross section of persons (registered voters) from whom the juries are drawn. The conduct of the Clerk must be judged by this standard. Did the Clerk substantially fail to provide a list of registered voters from which a fair cross section of jurors could be selected for jury duty?

The answer to this is clear. The 1973 voter registration lists in use in this district from 1973 to 1977 *did* represent a fair cross section of voters. The plan under which this district operated was filed and approved by the panel. The Clerk's nonfeasance did not make the voter registration list an unfair cross section. At most, certain names of young voters were not added in 1975, which might have been provided by their registration to vote in 1974 and 1975 in this state prior to a state-wide election in 1974 and 1975. There was no presidential election in either of those years, and, indeed, it might be contended that the pool of voters was actually larger in 1972 than it was in either 1974 or 1975.

In *U. S. v. Evans*, 526 F.2d 701 (5th Cir. 1976), it was charged that the deputy clerks made findings as to the qualifications and exclusion of jurors and that this constituted a failure to adhere to the procedure set forth in the Act and in the plan. While several other irregularities were charged, the major abuse claimed was the clerk's usurpation and abuse of the judicial function of determining excuses, exemptions, and disqualifications. Finding that the clerks did undertake these functions, the court nonetheless held that there was no violation of the statute and that when the clerks determined juror qualifications and exclusions, they did so on the basis of the criteria specified in the Act and without a discriminatory result. The court went on to say:

"In sum, no person or group was excluded from jury service on the basis of race, color, religion, sex, national origin, or economic status. No person was shown to have been rejected because of any extrastatutory, subjective criteria. The improprieties in the selection process did not operate to frustrate the goals of the Act. While we in no way mean to imply that the role of the judiciary should be lightly regarded, we conclude that these deviations in the selection process do not constitute a substantial failure to comply with the Act or the Plan."

*U. S. v. Evans*, supra at 706, 707.

In the case at bar, the Clerk's conduct was not deliberate. It was nonfeasance. It was not misfeasance. What he failed to do does not mean that we had in the Eastern District of Michigan a jury selection process constituting a substantial failure to comply with the Act.

Thus the Clerk's conduct cannot be held to be substantial failure to comply with the Act.

Other contentions of the defendant which are raised in the motion are without merit and need not be discussed.

For these reasons, defendant's motion to dismiss the indictment must be denied. An appropriate order may be submitted.