UNITED STATES of America
v.
John K. BRIGGS et al.
No. GCR ·1353.

United States District Court,
N. D. Florida,
Gainesville Division.
May 31, 1973.

Wm. H. Stafford, U. S. Atty., Pensacola, Fla., S. J. Carrouth, Asst. U. S. Atty., Tallahassee, Fla., for United States.

Doris Peterson, James Reif, Morton Stavis, Nancy Stearns, New York City, Larry G. Turner, Gainesville, Fla., Cameron Cunningham, Brady S. Coleman, Austin, Tex., for defendants.

ORDER

ARNOW, Chief Judge.

Defendants herein filed a motion to dismiss indictment and strike the petit jury array and to stay the proceedings and also motion for inspection, reproduction and copying of the records and papers in the custody of the clerk of court pursuant to 28 U.S.C. § 1867(a), (d) and (f). The latter motion was granted and an evidentiary hearing was held thereafter. (Because, in the interim, the master jury wheel involved was refilled, this hearing dealt only with the grand jury. Another motion addressed to the petit jury has now been filed and will be dealt with in a separate order.) In the original motion to dismiss the indictment and strike the petit jury array defendants based their challenge on the grounds that certain selection procedures and standards for jury service are violative of the Fifth and Sixth Amendments to the United States Constitution and do not substantially comply with 28 U.S.C. § 1861 et seq. At the hearing no evidence was presented concerning some of the matters alleged in the original motion nor were these matters mentioned in defendants' post-hearing memorandum.[1] The challenge now appears based on the matters brought out in the evidentiary hearing, which are the same as those covered in the memorandum. This decision, therefore, will deal only with these matters and in the order in which they are set forth in the memorandum.

## 1) WHETHER THE DECISIONS OF THE FIFTH CIRCUIT UPHOLDING THE PLAN AGAINST VARIOUS DISCRETE CHALLENGES BAR ANY ASPECT OF THE CHALLENGE HERE PRESENTED.

Initially, defendants contend that United States v. Kuhn, 441 F.2d 179 (5th Cir. 1971), upholding the Plan, is to be construed as only upholding that provision of the original Plan, now amended, which called for refilling the Master Wheel at five-year intervals and which resulted in claimed exclusion of

---

1. Various of the contentions set forth by defendants, and not detailed here, on which no evidence was presented, are, as a matter of law, under the Act and reported decisions, without merit. Whether, or to the extent, such accounts for failure of defendants to present evidence concerning them, this Court is not advised.

persons 21 to 23 years of age, which persons the court held not to constitute a cognizable group. With this narrow construction this Court cannot agree. In the last paragraph of its opinion the Court of Appeals stated "The 'Plan' fully conforms to the guidelines prepared by the Committee on the Operation of the Jury System and to the declared statutory policy of the United States to afford litigants the right to be tried by juries selected at random from a fair cross section of the community. 28 U.S.C. § 1861. There is nothing contained therein which could have caused a distinct group of the community to be systematically excluded . . ." In addition, in United States v. Gooding, 473 F.2d 425 (5th Cir. 1973), involving the Plan for the Southern District of Florida, the court specifically stated, "A similar plan for the Northern District of Florida was upheld in United States v. Kuhn . . ." This Court concludes the Plan is valid on its face as fully complying with statutory and constitutional requirements, such being determined both by this Court's own conclusion and the holdings of Fifth Circuit Court of Appeals.

Defendants further contend that the other Fifth Circuit cases which have considered the use of voter registration lists as the sole source of names for random selection from the Master Jury Wheel are also inapposite because of the various factors upon which those decisions were based. This Court readily concedes that the challenges presented in those cases may not have been as broad-based nor as exhaustively developed as that presented here. However, regardless of the particular challenge presented or the reason for its disposition in the various cases, the Fifth Circuit has repeatedly held that the use of voter registration lists "as the sole source of names for jury duty is constitutionally permissible unless this system results in the systematic exclusion of a cognizable group or class of qualified citizens." Camp v. United States, 413 F.2d 419, 421 (5th Cir. 1969), cert. den. 396 U.S. 968, 90 S.Ct. 451, 24 L.Ed.2d 434 (1969); United States v. Dangler, 422 F.2d 344 (5th Cir. 1970); Grimes v. United States, 391 F.2d 709 (5th Cir. 1968), cert. den. 393 U.S. 825, 89 S.Ct. 87, 21 L.Ed.2d 96 (1968). See also United States v. Allen, 445 F.2d 849 (5th Cir. 1971).

These cases bar any challenge to the Plan under attack unless it can be shown that, in its operation, the Plan results in systematic exclusion of a cognizable group or class of qualified citizens.

2) WHETHER THE UNDERREPRESENTATION OF BLACKS ON THE VOTER LIST FROM WHICH THE MASTER JURY WHEEL IS EXCLUSIVELY COMPOSED IS SUBSTANTIAL SO AS TO HAVE TRIGGERED THE DUTY UNDER THE FEDERAL JURY SELECTION AND SERVICE ACT TO SUPPLEMENT THE LIST WITH NAMES OF BLACKS DRAWN FROM OTHER SOURCES.

Although the cases cited in defendants' memorandum involve constitutional challenges, this challenge is apparently based solely on the provisions of 28 U.S.C. § 1863(b)(2) which provide for other sources of names in addition to the voter lists "where necessary to foster the policy and protect the rights secured by sections 1861 and 1862 . . ."

In the legislative history of the Act, contained in 1968 U.S.Code Cong. and Admin. News, page 1792 et seq., it is pointed out that the Act embodied two important principles—random selection of juror names from the voter lists of the district or division in which court is held, and determination of jury disqualification, excuses, exemptions and exclusions on basis of objective criteria only.

If the voter lists are used and supplemented where necessary and the procedures outlined in the Act are followed, then it is not required that at any stage beyond the initial source list the selection process shall produce groups that mirror community makeup, and no challenge lies on that basis. Moreover, from the history, it clearly appears that those

qualified as jurors but who do not register to vote are not to be considered—it points out that such provision is not unfair, because anyone with minimum qualifications relevant to jury service can cause his name to be placed on the list simply by registering or voting. The history also points out that the voting lists, themselves, contain an important built-in screening element in that they eliminate those individuals who are either unqualified to vote or are insufficiently interested in the world about them to do so.

This history of the Act adds up to one conclusion—the Congress, in adopting this Act, did not intend to depart from, but instead intended to expressly state in the law what by court decisions have been determined to be constitutional—and that is, that a fair cross-section of the community could be obtained from a voter registration list in which there had not been, either by the law, itself, or by the actions of the state officials administering the law, systematic exclusion of cognizable classes. The conclusion is clear that unless such is established, then any jury list drawn from such a voter list could and would, under the intent of Congress, represent and be a fair cross-section of the community as Congress intended that phrase.

Indeed, such is evident from the Act, itself, for it, by its plain terms, provides qualifications for jurors that necessarily exclude large numbers of residents of a community, and contain provisions for exemption, disqualification and excuse of others. Members in active service of the fire and police departments, public officers, those residing beyond specified distances—clearly, exemption of these, alone, will mean the jury lists cannot

and will not accurately mirror the community and that the Congress, in using the language "fair cross-section of the community," did not intend that meaning.

As the history points out, the principles that were embodied in it—the two important general principles previously mentioned—provide the best method for obtaining a jury list that represents a cross-section of the relevant community and for establishing an effective bulwark against impermissible forms of discrimination and arbitrariness. The whole key to the jury selection act is found in those two principles—random selection and objectivity. If those are assured, then the fair cross-section principle of the Act is also assured. In this case, that there may be underrepresentation of various groups is completely meaningless—so long as there has not been shown systematic exclusion of some cognizable group in Florida's voting law or by the actions of those administering its law, there can be and is the objectivity that the Act of Congress intended and contemplated.

■ Of course, that objectivity could be destroyed by actions of the court officials who implement the Plan, and if it is shown that they have substantially departed from the Plan, then that objectivity would also be destroyed. But absent the foregoing, evidence of substantial underrepresentation in jury lists, standing alone, is not sufficient to establish substantial failure to comply with the Act.[2]

Turner v. Fouche, 396 U.S. 346, 90 S. Ct. 532, 24 L.Ed.2d 567 (1970) and Carter v. Jury Commission, 396 U.S. 320, 90 S.Ct. 518, 24 L.Ed.2d 549 (1970), cit-

2. Beyond that, statistics presented by defendants may be suspect. An article in May, 1973 issue of Florida Trend magazine refers to an analysis of data assembled by College of Social Science of Florida Atlantic University obtained from the 1970 U. S. census. According to the article the black median age in Florida in 1970 was 24.1 years, compared to a white median age of 34.8. According to it, also, 24% of blacks were in age 10 to 19 year group and 13% in age 5 to 9 group. If only 3% were added to include those aged 1 to 5 and aged 20, 40% of Florida's blacks were ineligible to vote. On this Court's quick and possibly inaccurate computation, this would mean somewhere between 55% and 59% of blacks in the counties of Florida here involved were registered to vote.

ed by defendants, and other cases dealing with procedures allowing subjective determination, are inapposite here.

In view of the foregoing, the Court concludes that mere showing of substantial underrepresentation on the voter registration lists is insufficient to have triggered a duty to supplement the lists with names from other sources, or, as hereafter pointed out, on the facts presented here to raise a prima facie case of failure to meet the constitutional requirements.

3) WHETHER THE UNDERREPRESENTATION OF BLACKS ON THE VOTER LISTS VIOLATES CONSTITUTIONAL STANDARDS FOR A FAIR CROSS-SECTIONAL, NON-DISCRIMINATORY JURY SELECTION PROCESS.

■■ As mentioned earlier, the use of voter registration lists as the sole source of names for jury duty is constitutionally permissible unless this system results in systematic exclusion of a cognizable group or class of citizens. United States v. Dangler, supra; Camp v. United States, supra; Grimes v. United States, supra. Defendants cite numerous cases involving state jury selection procedures. Under these cases and others, to make out a prima facie case of invidious discrimination a defendant need only show substantial disparity between the proportion of blacks chosen for jury duty and the proportion of blacks in the eligible population. However, in the cases standing for this proposition, the opportunity to discriminate arose under the state statutes involved, which permitted those selecting jury panels to use their subjective judgment, and the procedures used were such that the race of prospective jurors could be determined in various ways at the time such subjective judgment was being ex-

ercised. This method of selection is to be contrasted with a system of random selection from a central source or sources using objective criteria. Preston v. Mandeville, 428 F.2d 1392 (5th Cir. 1970). The Plan here involved provides for random selection based on objective criteria from the voter registration lists, a central source, so the situation here is not the same as that involved in the cases cited. It has been held in at least one circuit that the use of voter registration lists as the sole source of names for potential jurors is not constitutionally invalid absent a showing of discrimination in compiling such lists. United States v. Parker, 428 F.2d 488 (9th Cir. 1970), cert. den. 400 U.S. 910, 91 S.Ct. 155, 27 L.Ed.2d 150 (1970).[3] The Florida voter registration statutes, F.S. 97 and 98, F.S.A., on their face do not permit systematic exclusion of any cognizable class nor do they permit discrimination. It is therefore necessary to show that underrepresentation of blacks on the voter registration lists results from some positive acts of discrimination against blacks on the part of Florida election registration officials, since it has repeatedly been held that persons who do not choose to vote do not constitute a cognizable class. United States v. Dangler, supra; Chance v. United States, supra; Camp v. United States, supra; United States v. Kelly, 349 F.2d 720 (2nd Cir. 1965), cert. den. 384 U.S. 947, 86 S.Ct. 1467, 16 L. Ed.2d 544 (1966) and cases cited therein. (See also legislative history discussed under 2.) Absent a showing of discrimination, the only conclusion to be drawn from underrepresentation of blacks on the voting lists is that more blacks than whites chose not to vote.

Defendants have attempted to show systematic exclusion through discrimination against blacks in the compiling of

---

3. In addition, Fifth Circuit, in Chance v. United States, 322 F.2d 201 (1963) pointed out that Thiel v. So. Pacific, 328 U.S. 217, 66 S.Ct. 984, 90 L.Ed. 1181 (1946), lists six groups or classes which may not be excluded as jurors: economical, social, religious, racial, political, geographical. And the Court went on to say: "The use of voter registration lists is unlawful only if such use is a subterfuge to exclude systematically and intentionally members of those groups or classes, inasmuch as those who fail to register are not a cognizable class."

the voter registration lists by the testimony of several persons who worked in voter registration drives, and by copies of newspaper articles admitted in evidence.

Yet the evidence falls far short of so disclosing.

The evidence presented concerned itself with only two of the eighteen counties in the Northern District of Florida here involved—Leon and Gadsden. The testimony of the registration supervisor in Leon County, produced as a witness by defendants, makes it abundantly clear there was no systematic exclusion of blacks in that county—to the contrary, that supervisor went out of her way to afford them opportunity to register.

Insofar as Gadsden County was concerned, the testimony did indicate racial discrimination at one time existing, or at least attempted, in municipal elections in one small municipality in that county. Yet from defendants' witnesses who testified concerning that, it was established that, as far as the county election officials were concerned, no blacks who were eligible to vote were prevented from registering. One witness, for example, concerned with the municipal election, testified he personally carried a good many blacks to the county office to register, and that all who were qualified were permitted to register.

No witness produced by defendant knew of any blacks qualified to register who were refused the right to do so.

Defendants, in apparent endeavor to counter the paucity of their evidence respecting actual discrimination, contend that many blacks were afraid to register and advance various contentions they say support that position. That such fear may have existed establishes no basis for holding of systematic exclusion of blacks from the voter lists, particularly where, as here, there is, in the only evidence produced by defendants, strong showing that the election officials administering Florida's election laws threw no impediment in the way of qualified blacks who sought to register to vote. Beyond that, the evidence showed that substantial percentages of the black population, though less than the percentages of the white population, were in fact registered to vote. Clearly the fear contended for by defendants, if in fact it existed to any degree, failed to exist in large numbers of the black population. Under the evidence presented, it is equally inferable that the percentage disparity between whites and blacks registered to vote resulted not from fear on the part of the blacks, but from the fact that they, like indeed many of the whites, chose not to register. And, of course, under neither the Act nor constitutional requirements would non-voters be a cognizable or distinct group.

It may well be that in Florida, as in other parts of the nation, at one time efforts were made by state election officials to prevent blacks as a race from voting. But nothing here discloses such situation existing at the time or in connection with Florida's voting registration lists from which the names of jurors here were drawn.

Defendants contend blacks as a race, because of prior racial discrimination, are inhibited from registering to vote. Yet substantial numbers of them, on the evidence, in the Northern District of Florida are not so inhibited. If there be blacks who do not choose to register to vote because they are so inhibited, they would no more constitute a cognizable group than would other non-voters who for various reasons chose not to register. The record here shows no systematic exclusion of blacks from Florida's voting lists, whether they be inhibited or uninhibited.

Defendants contend here, in effect, that the jury panel must mirror the community. It is clear beyond cavil that neither the Act nor the Constitution require such; the concept of a fair cross-section of the community neither permits nor requires such to be done.

4) WHETHER THE UNDERREPRESENTATION OF YOUNG PEOPLE BETWEEN THE AGES OF 21 and 29 IS SUBSTANTIAL SO AS TO TRIGGER THE DUTY TO SUPPLEMENT FOR THE MASTER JURY WHEEL, AND ADDITIONALLY WHETHER THE LISTS SHOULD, BECAUSE OF THE IMPACT OF RESIDENTIAL MOBILITY OF YOUNG PEOPLE, BE SUPPLEMENTED FROM THE SUBSEQUENT VOTER LISTS ACCORDING TO THE PLAN REQUIREMENT TO THE NEAREST PRACTICABLE DATE, OR OTHER MORE PRECISE SOURCES.

■ Contrary to defendants' assertion, the majority of courts which have considered the question have held young people not to constitute a cognizable class. United States v. Guzman, 337 F. Supp. 140 (S.D.N.Y. 1972) affirmed 468 F.2d 1245 (2nd Cir. 1972) and cases cited therein. United States v. Butera, 420 F.2d 564 (1st Cir. 1970) seems to stand alone in reaching a contrary conclusion. Defendants contend the fact that the group which they assert to be cognizable, persons between 21 and 29 years of age, covers a broader age range than that asserted in most cases distinguishes this situation from other cases. However, other courts have held that persons in age ranges as broad or even broader do not constitute a cognizable class. United States v. Guzman, supra, 337 F. Supp. at 146 and cases cited therein.

The testimony of Jay Schulman, presented by defendants as a witness in this regard, affords to this court no basis for holding persons in this age group to be a distinct or cognizable group under or within the meaning of the reported decisions.

5) WHETHER THE AUTOMATIC HARDSHIP EXCUSE ON INDIVIDUAL REQUEST PROVIDED WOMEN WITH CHILDREN UNDER 10 IS CONSTITUTIONALLY PERMISSIBLE AND/OR JUSTIFIABLY BASED ON CIRCUMSTANCES WHICH CONSTITUTE UNDUE HARDSHIP AND EXTREME INCONVENIENCE FOR THIS CLASS, IN ACCORDANCE WITH THE AUTHORIZATION OF THE STATUTE.

■ Under 28 U.S.C. § 1863(b)(5) a plan may specify those groups of persons who shall be excused on individual request if the court finds and the plan states that jury service by such group would entail undue hardship or extreme inconvenience. The Plan here involved provides for excuse upon request of women with children under 10. As pointed out previously, the Plan has been upheld in United States v. Kuhn. In addition, the Ninth Circuit, in United States v. Eskew, 460 F.2d 1028 (9th Cir. 1972) specifically held that a similar provision in a California plan did not violate the provisions of the Act. In Hoyt v. Florida, 368 U.S. 57, 82 S.Ct. 159, 7 L.Ed.2d 118 (1961) the court held constitutional the much broader Florida statute providing no woman should be called for jury service unless she had registered to be put on the list. Defendants can, of course, derive small comfort from their speculative contention that, had the court reached the question involving a similar Louisiana statute in deciding Alexander v. Louisiana, 405 U. S. 625, 92 S.Ct. 1221, 31 L.Ed.2d 536 (1972), *Hoyt* might well have been repudiated. This court concludes that the excusal upon request of women with children under 10 is constitutionally permissible and does not violate the provisions of the Act.

6) WHETHER THE PROCESSING OF DISCRETIONARY HARDSHIP EXCUSES CONSTITUTED A SUBSTANTIAL FAILURE TO COMPLY WITH THE JURY PLAN AND THE JURY ACT.

■ 28 U.S.C. § 1866(c)(1) provides for excusal by the court of any person upon a showing of undue hardship or extreme inconvenience for such period as the court deems necessary. Section VI of the Amendments to the Plan provides for such excuses using the language of the statute and further provides that the names of persons so ex-

cused shall be returned to the qualified jury wheel unless the court granting the excuse should rule otherwise at the time of the excuse. Defendants contend that from March, 1971 to March 14, 1973 the names of persons excused were not returned to the jury wheel and that some of the discretionary hardship excuses granted were "dubious" in that they provided no documentation and the requests do not show hardship on their face. Conceding arguendo these contentions, the evidence here presented falls short of showing substantial failure to comply with the Plan and the Act.

## CONCLUSION

In final analysis, defendants' broad-gauged attack, relying in part on decisions based on jury selection plans containing subjective factors, and to large extent on speculative and questionable opinion and statistical evidence, is ill founded. Here there is an Act of Congress containing objective factors and a random sampling that complies with all constitutional requirements, and a jury plan that complies with the Act and all constitutional requirements. The Plan is tied to Florida's voting lists, as the Act contemplates. Florida's voting registration statutes, on their face, do not call or provide for systematic exclusion of any distinct or cognizable groups, nor possess constitutional defects—it is not even contended they do. Thus, absent showing of systematic exclusion by Florida's voting officials of a cognizable group, constitutional requirements are met—and the evidence falls far short of showing such. As far as the Act is concerned, there must be, under its terms, substantial failure to comply with it— and the evidence falls far short of disclosing that as well. Unlike the situation existing in the cases cited by defendants, in which the jury selection process allowed consideration of subjective factors, and because of that the evidence established prima facie case of systematic exclusion, the case presented by defendants here is insufficient to establish prima facie statutory or constitutional violation.

Finally, along with the post-hearing memorandum that defendants were permitted to file, certain affidavits and proffers of testimony in written form by witnesses are also submitted.

At the hearing, because the hearings were going too slowly with witnesses not present when required, the court refused to allow some witnesses to appear at this hearing and, on the court's recollection, allowed defendants to proffer at that time their testimony in the record.

This court has no recollection of giving authorization for all of these various proffers and further affidavit of Mr. Schulman that have been tendered.

If such have been filed or sought to be tendered without authority, then, of course, such act is improper on counsel's part. However, the government has filed no reply memorandum and presented no objection to these being made a part of the record, and of course, it may be that the court is wrong in not recalling that such was authorized.

In an abundance of caution, and to save time, the court will allow these various matters to be proffered for record purposes. It has considered them, and finds nothing in them to change in any respect the holding here reached.

In view of the foregoing, it is

Ordered that defendants' foregoing motion to dismiss indictment and stay proceedings should be and it is hereby denied.