COMMONWEALTH vs. MARK E. BASTARACHE.

Franklin. November 7, 1980. — December 12, 1980.

Present: HENNESSEY, C.J., QUIRICO, BRAUCHER, KAPLAN, & WILKINS, JJ.

*Jury and Jurors. Constitutional Law,* Equal protection of laws, Jury. *Evidence,* Photograph, Judicial discretion. *Homicide. Self-Defense. Proximate Cause. Practice, Criminal,* Instructions to jury.

Although the provisions of G. L. c. 234, § 1, require that a town's selectmen, in compiling a jury list, avoid arbitrary or capricious action and any action that violates any constitutional mandate, there is in § 1 no separate requirement of the use of a random selection process or of a proportionate distribution on jury lists of citizens based on their ages. [88-94]

Discussion of standards for evaluating claims of unconstitutional discrimination in the composition of grand and petit juries. [94-97]

The record and findings on a defendant's claim of unconstitutional underrepresentation of persons between the ages of eighteen and thirty-four on the municipal jury lists from which were drawn the grand jury that indicted him and the petit jury that tried him warranted conclusions that classifications based on age alone do not involve identifiable or distinctive groups for Federal constitutional purposes, that there was no intentional discrimination against persons under thirty-five by the selectmen compiling the jury lists, and that the procedures followed in the "key man" system for compiling the lists were properly based on practical considerations and were not discriminatory. [97-101]

A defendant failed to demonstrate any State constitutional basis for successfully challenging the petit jury that tried him because of the alleged underrepresentation on the jury lists of persons between the ages of eighteen and thirty-four. [101-102]

Because the "key man" system for compiling jury lists contains the possibility of abuse, this court, acting under its constitutional and statutory duty to oversee the administration of justice in the courts of the Commonwealth, requested the Attorney General to prescribe procedures for the compilation of jury lists in those cities and towns that are not using a substantially random selection process. [102-103]

At a criminal trial, the judge erred in charging the jury that a finding of involuntary manslaughter would be warranted if the defendant had wantonly and recklessly abandoned the victim after striking him with

his fists, without taking reasonable steps to obtain medical assistance, where there was no evidence that any delay, attributable to the defendant, in providing medical attention was a cause of the victim's death. [104]

At the trial of a defendant charged with manslaughter, the judge erred in instructing the jury that the defendant could not claim that he acted in self-defense in striking the victim with his fists if he knew or should have known that the victim was drunk and susceptible to injury. [104-105]

At a manslaughter trial, although autopsy photographs of the victim's brain and of the interior of his skull after the brain was removed were inflammatory, graphic, and grisly, they were relevant to the Commonwealth's theory of the cause of the victim's death. [105-106]

Discussion of considerations to be taken into account by the judge at a criminal trial in determining whether to admit in evidence autopsy photographs. [106]


INDICTMENT found and returned in the Superior Court Department on September 13, 1978.

Pretrial motions were heard by *Cross*, J., and the case was tried before him.

After review by the Appeals Court, the Supreme Judicial Court granted leave to obtain further appellate review.

*Thomas Lesser* (*William C. Newman* with him) for the defendant.

*Stephen R. Kaplan*, Assistant District Attorney (*Barbara A.H. Smith*, Assistant Attorney General, with him) for the Commonwealth.

*Nancy Gertner*, for Civil Liberties Union of Massachusetts & *Andrew Good*, for Massachusetts Association of Criminal Defense Lawyers, amici curiae, submitted a brief.

*Francis X. Bellotti*, Attorney General, & *Barbara A.H. Smith*, Assistant Attorney General, for Attorney General & various district attorneys, amici curiae, submitted a brief.

WILKINS, J. In its broader significance, this appeal from the defendant's conviction of manslaughter concerns the legality of the composition of the grand jury that indicted him and the petit jury that tried him. In brief, the defend-

ant challenges the underrepresentation of persons between the ages of eighteen and thirty-four, inclusive, on municipal jury lists from which his grand and petit juries were derived. The Appeals Court held that the Commonwealth had failed to rebut the defendant's prima facie case that "a sufficiently large and distinct group of people in Franklin County (eighteen-to-thirty-four year olds) has been substantially underrepresented in the venire from which both grand and petit jury pools are drawn." *Commonwealth* v. *Bastarache,* 10 Mass. App. Ct. 499, 508 (1980). The intended consequence of the Appeals Court decision was not only the reversal of the conviction, but also the dismissal of the indictment. We granted the Commonwealth's application for further appellate review and now express our disagreement with the Appeals Court's conclusion that the age group (eighteen to thirty-four) was underrepresented in violation of the Sixth Amendment to the Constitution of the United States. Further, we reject the defendant's challenges to the composition of the jury lists based on other grounds.

In its lesser significance, this appeal involves the defendant's various challenges to his conviction. The Appeals Court reversed the defendant's conviction on certain of these grounds. We agree that the defendant's conviction must be reversed but defer our consideration of this subject until we have disposed of the defendant's challenge to the composition of the grand and petit juries.

1. By a pretrial motion filed in the Superior Court, the defendant challenged the composition of the jury lists from which were drawn the grand jury that indicted him and the petit jury that tried him. This motion sought a dismissal of the indictments and of the jury pool, asserting a violation of the Constitution of the United States and G. L. c. 234 and G. L. c. 277. No claim was then made under any State constitutional provision. In the Appeals Court, the defendant's brief focused solely on the Federal constitutional (Sixth Amendment) point, ignoring any claim of a violation of any statute or provision of the Constitution of the Commonwealth. In his brief before this court, however, the de-

fendant relies on asserted statutory violations in the method by which jury lists were compiled, and he presents, for the first time, an argument that a systematic exclusion of persons between the ages of eighteen and thirty-four violated art. 12 of the Declaration of Rights of the Constitution of the Commonwealth.  The defendant acknowledged at oral argument that, because a grand jury indictment is not required under the Fourteenth Amendment as a condition precedent to a State criminal trial (*Hurtado* v. *California*, 110 U.S. 516 [1884]), his challenge to the composition of the jury lists from which his grand jury was chosen does not rest on Sixth Amendment considerations but only on the equal protection clause of the Fourteenth Amendment.[1]

The facts that relate the defendant's challenge to the composition of the municipal jury lists can be summarized briefly.. Figures from the 1970 United States census show that persons between eighteen and thirty-four, inclusive, represented approximately 36% of the population of Franklin County eligible for jury duty.  Although the figure varied from year to year, during the times relevant to this case, only approximately 18.5% of the persons on the jury lists from which grand and petit juries were selected were within the indicated age group.  From the testimony of selectmen and employees of most of the twenty-six towns (there are no cities), it is clear that there was no conscious attempt to select older citizens or to discriminate against persons under the age of thirty-five (or any other age).  The judge so found.  The judge also found that each jury was drawn from a jury pool representative of a fair cross section of the community and that persons under thirty-five years of age were reasonably represented in the various jury pools.

---

[1] In *Brunson* v. *Commonwealth*, 369 Mass. 106, 117 (1975), we assumed, but expressly did not decide, that the Sixth Amendment requirements of *Taylor* v. *Louisiana*, 419 U.S. 522 (1975), applied equally to grand juries as they did to petit juries.  Opinions of the Supreme Court since 1975, which we shall discuss subsequently, indicate that Sixth Amendment requirements do not apply to challenges to the composition of State grand juries.

He further found that failures to comply with statutory requirements were minimal, unintentional, and inadvertent. The judge found that there was no evidence that the selection process was other than at random, that the age group from eighteen to thirty-four did not possess any inherent characteristics which distinguished it from any other age group, and that the disparity between the number of younger persons actually included in the jury pools and the number eligible was the result of random influences on the selection process, combined with the statutory requirements for jury selection. These findings of fact cannot be ignored to the extent that they are supported by evidence. See *Hernandez* v. *Texas*, 347 U.S. 475, 478 (1954).

In the face of the judge's contrary findings, the defendant makes a strong case that the disparity between 18.5% and approximately 36% is not the coincidental result of random selection. On the factual question whether the age group from eighteen to thirty-five has any inherent, common, or distinguishing characteristic or quality, beyond age itself, the defendant's case is not so compelling as to make plainly wrong the judge's finding that the group was not distinguishable from other age groupings. On the other hand, we would accept as a matter of common knowledge the view that, on certain subjects, younger people often tend to have different opinions, reactions, and impressions from older people. See Zeigler, Young Adults as a Cognizable Group in Jury Selection, 76 Mich. L. Rev. 1045, 1074-1076 (1978). We repeat, however, that there was no evidence that persons potentially selected in the various towns for jury duty were designated with any intentional bias against younger citizens. Contrast *Thiel* v. *Southern Pac. Co.*, 328 U.S. 217, 221-224 (1946).

We turn first to a description of the statutory procedure by which persons are placed on a municipal jury list.[2] Any

---

[2] This description is inapplicable to Middlesex County, which is governed by special procedures for the selection of jurors. See G. L. c. 234A, inserted by St. 1977, c. 415, § 2; and St. 1977, c. 415, § 8, making certain

person qualified to vote for representatives to the General
Court, whether a registered voter or not, is liable to serve as
a juror, except that certain persons are exempt. G. L.
c. 234, § 1, as amended through St. 1978, c. 478, § 265.[3]
Among the "exempt" persons, persons seventy years of age
or over, and persons having custody of and being responsi-
ble for the daily supervision of a child under fifteen years of
age, may elect not to have their names placed on the list of
jurors. The statute makes clear that as to these persons, the
choice is theirs, and they should not be denied the right to

provisions of G. L. c. 234 inapplicable to the new Middlesex County pro-
cedure. The Middlesex County selection procedure has much to com-
mend it for its assurance of randomness in the selection process. See G. L.
c. 234A, §§ 7-9, 14.

[3] Amendments to G. L. c. 234, § 1, in 1978 have no relevance to the
issues before us. Section 1, as now amended, reads as follows:

"A person of either sex qualified to vote for representatives to the
general court, whether a registered voter or not, shall be liable to serve as
a juror, except that the following persons shall be exempt:

"The governor; lieutenant governor; members of the council; state
secretary; members and officers of the senate and house of representatives
during a session of the general court; judges and justices of a court; county
commissioners; clerks of courts and assistant clerks and all regularly ap-
pointed officers of the courts of the United States and of the com-
monwealth; registers of probate and insolvency; registers of deeds; sheriffs
and their deputies; constables; marshals of the United States and their
deputies, and all other officers of the United States; attorneys at law; set-
tled ministers of the gospel; officers of colleges; preceptors and teachers of
incorporated academies; registered practicing physicians and surgeons;
superintendents, officers and assistants employed in or about a state
hospital, insane hospital, jail, house of correction, state industrial school
or state prison; teachers in public schools; enginemen and members of the
fire department of Boston, and of other cities and towns in which such ex-
emption has been made by vote of the city council or the inhabitants of
the town; Christian Science practitioners and readers, respectively;
trained nurses; assistants in hospitals; attendant nurses; members of
religious orders.

"A parent or person having custody of and being responsible for the dai-
ly supervision of a child under fifteen years of age may elect not to have
his name placed on the list of jurors and in such event he shall be treated
as a person exempt from jury duty under this section.

"A person seventy years of age or over may elect not to have his or her
name placed on the list of jurors and in such event he or she shall be
treated as a person exempt from jury duty under this section."

make a choice whether to serve.[4]  Once a person has served
as a juror, he or she is not liable to be drawn or to serve
again within three years after the end of his or her service
(except in Nantucket and Dukes counties where there is a
two-year exemption).  G. L. c. 234, § 2.

Section 4 of G. L. c. 234, as amended through St. 1980,
c. 177, provides, as to towns, that each year before July first
the board of selectmen shall "prepare a list of such in-
habitants of the . . . town, qualified as provided in section
one, of good moral character, of sound judgment and free
from all legal exceptions, not exempt from jury service
under section one or two, as they think qualified to serve as
jurors."  Because the process of selection of jurors involves
choices by community representatives, the system used in
this State has been called a "key man" system.  Section 4
prescribes various procedures by which the selectmen may
determine that a person is qualified for jury duty, including
the distribution of a questionnaire to be answered under
oath.  Section 4 provides further that such lists (except in
Nantucket and Dukes counties) shall include no less than
one juror for every one hundred inhabitants and no more
than one for every sixty inhabitants.  No person's name shall
appear on the jury lists for more than three successive
years.[5] Before August first in each year, a printed list is to be
prepared and delivered to the selectmen, the town clerk,
and clerks of court.  G. L. c. 234, § 5. The selectmen are
then to cause the name of each person on the jury list to be

---

[4]As to other exempt persons, § 1 (read with other portions of G. L.
c. 234) may be read to make the exemption automatic and to give the
individual no option to serve.  See G. L. c. 234, § 4, and G. L. c. 234,
§ 20, discussed in n.6 below.  However, the inclusion of a currently ex-
empt person on the jury list might be justified on the theory that the
ground for the exemption might have ended by the time his or her name is
drawn. In any event, we would see no valid objection to a jury list that in
fact contained one or more exempt persons or to service by such a person
on a jury.

[5]In many towns in Franklin County, approximately one-third of the
jury list is changed each year with new names being added and the names
of those who have been on the list for three years being removed.

written on a separate "ballot" and placed in a box to be kept by the town clerk. G. L. c. 234, § 7. When an order for jurors is issued, the selectmen in the town, meeting publicly, draw the appropriate number of "ballots" from the box. G. L. c. 234, §§ 17, 19.[6]

The defendant's basic statutory argument rests on the contention that under G. L. c. 234 the selection procedure followed in compiling jury lists must be based on principles of randomness. He argues that the impartial procedures prescribed by G. L. c. 234 to be followed in drawing prospective jurors' "ballots" from the box maintained by the town clerk and the impartial procedures to be followed in drawing jurors from venires at the courthouse (see G. L. c. 234, § 25) are so carefully expressed in order to assure randomness that the selectmen should not be held to have unregulated discretion at the initial stage, i.e., in compiling a municipality's jury list. In quite another context, this court has noted that a defendant's constitutional right under art. 12 of the Declaration of Rights to a trial by jury consists of the right to have "issues of fact . . . determined by the composite judgment of a fairly numerous and representative body of impartial residents of the county selected at large rather than by the judgment of one or of a small number of single individuals who may be subject to peculiar prejudices or whose station and personal experiences in life may have failed to provide them with sufficient understanding of the conditions and circumstances in which the parties acted." *Commonwealth* v. *Bellino,* 320 Mass. 635, 639, cert. denied, 330 U.S. 832 (1947). Surely, any practice in drawing jury lists that failed to produce "a fairly numerous and representative body of impartial residents" would be in-

[6] General Laws c. 234, § 20, provides that "[i]f a person drawn . . . is exempt or unable by reason of illness or absence from home to attend as a juror or has so served in any court . . . [within three years], his name shall thereupon be returned to the box and another drawn." This language suggests that the selectmen must decline to submit the name of a person who is exempt and must return his or her "ballot" to the box, presumably on the theory that, if and when his or her name is again drawn, the exemption may have ended.

consistent with the requirements of G. L. c. 234, § 1, as
well as art. 12 of the Declaration of Rights. More recently
we said that "the ultimate touchstone of constitutionality is
whether the system as a whole and in a general sense is or is
not calculated to produce as triers a fair cross-section of the
populace." *Commonwealth* v. *Peters*, 372 Mass. 319, 322
(1977). Thus, although we read into G. L. c. 234, § 1, a
requirement that selectmen avoid arbitrary or capricious
action and any action that is in violation of any constitu-
tional mandate, we find in § 1 no separate requirement of
the use of a random selection process or of a proportionate
distribution on jury lists of citizens based on their ages. See
*Commonwealth* v. *Beneficial Fin. Co.*, 360 Mass. 188, 213
(1971), cert. denied sub nom. *Farrell* v. *Massachusetts*, 407
U.S. 910, and sub nom. *Beneficial Fin. Co.* v. *Massachu-
setts*, 407 U.S. 914 (1972). Viewing the evidence as a whole
for the county of Franklin, we see no statutory basis for con-
demning the process by which the jury lists were compiled.
We thus turn to the defendant's constitutional challenges to
the jury lists.

In this court, Federal constitutional challenges to the
absence or underrepresentation of persons below a certain
age have been uniformly unsuccessful. In 1924, persons
under twenty-five years of age were added to the group of
persons exempt from jury duty in Massachusetts. G. L.
c. 234, § 1 (codification of 1921), as amended by St. 1924,
c. 311, § 1. In 1971, we rejected a defendant's constitu-
tional challenge to the exclusion of persons under twenty-
five years of age from his 1968 jury panel, saying the claim
"requires no discussion." *Commonwealth* v. *Therrien*, 359
Mass. 500, 507 (1971). The court cited *Commonwealth* v.
*Slaney*, 350 Mass. 400, 402 (1966), where this court had said
that the allegedly excluded class (persons under twenty-five)
was not of the kind contemplated by *Swain* v. *Alabama*, 380
U.S. 202, 205 (1965) (racial or political bases of discrimina-
tion against an "identifiable group in the community which
may be the subject of prejudice"), and that the record failed
to demonstrate, in any event, that the exclusion of persons

under twenty-five resulted from a systematic policy rooted in prejudice. In 1969, the exemption for persons under twenty-five years of age was replaced by an exemption for persons under twenty-two years of age. See G. L. c. 234, § 1, as amended by St. 1969, c. 148, § 1.[7]

In a 1973 case, challenging this new exemption, we reaffirmed the view expressed in the *Therrien* case. *Commonwealth* v. *Lussier*, 364 Mass. 414, 423-424 (1973) ("We perceive no reason why we should treat the defendant's argument any differently today"). In that same year, we recognized that "any timely substantiated representation that the jury selection system is biased against any identifiable group would deserve the most careful attention." *Commonwealth* v. *Rodriguez*, 364 Mass. 87, 92 (1973) (assertion that jury pools contained no Puerto Ricans or blacks). However, when a defendant's challenge to a jury venire, based on a variety of grounds, was considered by this court in 1977, we observed that underrepresentation of persons under a particular age has been held not to be a cognizable basis for challenging the venire. *Commonwealth* v. *Peters*, 372 Mass. 319, 321-322 (1977).[8]

---

[7]The explicit exemption for persons under any particular age was deleted from G. L. c. 234, § 1, effective January 1, 1974, as part of the act that reduced the age of majority from twenty-one to eighteen years of age. See St. 1973, c. 925, § 1, as to the redefinition of a "minor," amending G. L. c. 4, § 7; St. 1973, c. 925, § 76, striking the words "persons under twenty-two years of age" from G. L. c. 234, § 1; and St. 1973, c. 925, § 84, for the effective date. The effect of the 1973 act on the minimum age qualification for jurors was to make all persons who had attained the age of eighteen liable for jury duty, subject, however, to any applicable exemption.

[8]In *Commonwealth* v. *Campbell*, 378 Mass. 680, 691 (1979), we assumed, without deciding, that persons under sixty-five possessed characteristics sufficiently discrete to justify treating them as a constitutionally significant class of persons. In the *Campbell* case, there was no showing of a systematic exclusion of persons under sixty-five.

In February of this year, the Appeals Court considered a claim that persons under forty were systematically excluded from Hampshire County juries. *Commonwealth* v. *Scanlan*, 9 Mass. App. Ct. 173, 176 (1980). That court did not pass on whether the age group was a "cognizable

The defendant challenges the jury lists both as they affected the composition of the grand jury that indicted him (an equal protection argument) and the petit jury that convicted him (a Sixth Amendment argument). The test which the Supreme Court applies appears to differ in the two instances.

In an equal protection challenge to the selection of a grand jury, a criminal defendant must show that the procedure employed resulted in a substantial underrepresentation of his race or of an identifiable group to which he belongs. *Castaneda* v. *Partida*, 430 U.S. 482, 494 (1977). "The first step is to establish that the group is one that is a recognizable, distinct class, singled out for different treatment under the laws, as written or as applied." *Id.* Next, there must be a demonstration of disproportionate underrepresentation over a significant period of time. Finally, if the selection procedure is susceptible of abuse or is not racially neutral, the statistical showing supports the presumption of discrimination.[9] *Id.* On such a showing, the burden shifts to the State to rebut the inference of intentional discrimination. *Id.* at 495, 497-498.

The proof required in a Sixth Amendment claim that a petit jury was not "drawn from a source fairly representative of the community" (*Taylor* v. *Louisiana*, 419 U.S. 522, 538 [1975]) is stated in *Duren* v. *Missouri*, 439 U.S. 357, 364 (1979). A prima facie violation of the fair cross section requirement is made out by a showing that (1) the group allegedly discriminated against is a "distinctive" group in the community, (2) that the group is not fairly and reasonably represented in the venires in relation to its proportion of the

group" because, assuming it was, there was no factual basis for the defendant's claim.

[9] Although the "key man system," one in which selected people ("key" men and women) choose prospective jurors, has been upheld against a facial challenge (*Carter* v. *Jury Comm'n*, 396 U.S. 320, 331-337 [1970]), the Supreme Court has described it as "highly subjective" and "susceptible of abuse as applied." *Castaneda* v. *Partida*, 430 U.S. 482, 497 (1977). See *Hernandez* v. *Texas*, 347 U.S. 475, 479 (1954).

community, and (3) that underrepresentation is due to systematic exclusion of the group in the jury selection process. *Id.* Once such a prima facie case is demonstrated, the State may justify it by a showing that one or more significant State interests will "be manifestly and primarily advanced by those aspects of the jury-selection process, such as exemption criteria, that result in the disproportionate exclusion of a distinctive group." *Id.* at 367-368.

Comparing the equal protection and Sixth Amendment tests, distinctions appear. The focus of the equal protection clause has been on classes that have historically been saddled with disabilities or subjected to unequal treatment. See *San Antonio Independent School Dist. v. Rodriguez,* 411 U.S. 1, 28 (1973). Sex, race, color, religion, or national origin are the prime examples. Central to the Sixth Amendment, on the other hand, is the broader principle that juries should be drawn from a source fairly representative of the community. *Taylor* v. *Louisiana, supra.* It is conceivable, therefore, that a group might constitute a "distinctive" group in the community for Sixth Amendment purposes but not an "identifiable" group for equal protection purposes.

The second element in each test — disproportionate underselection of persons in the group for jury venires — is expressed in substantially the same language. However, the third elements in establishing the respective prima facie cases differ. Equal protection, for the purposes of the case before us (i.e., one not based on race), requires a showing that the selection procedure is susceptible of abuse, while the Sixth Amendment requires a showing that the underrepresentation is due to systematic exclusion of the group in the selection process.

Finally, the burden that is shifted to the State on a showing of a prima facie case is different in the two instances. Equal protection principles allow the State to show an absence of intent to discriminate, while the Sixth Amendment test appears to involve less a question of intent than a showing that there were significant interests served by the selection process that resulted in the exclusion or underrep-

resentation of a distinctive group. See *Duren* v. *Missouri,*
*supra* at 368 n.26; and *supra* at 371 (Rehnquist, J., dissent-
ing).

Classifications based on age have been rejected as an
"identifiable group" (for equal protection purposes) or as a
"distinctive" group (for Sixth Amendment purposes) in vir-
tually every Federal case that has dealt with the question.
Cases in the Federal courts dealing with challenges based on
age to the composition of Federal grand and petit juries are
listed in the margin.[10]

---

[10] See *United States* v. *Kleifgen,* 557 F.2d 1293, 1296 (9th Cir. 1977)
(young persons, grand jury); *United States* v. *Potter,* 552 F.2d 901, 905
(9th Cir. 1977) (persons eighteen to thirty-four, grand jury); *United States*
v. *Test,* 550 F.2d 577, 590-593 (10th Cir. 1976) (persons twenty-one to
twenty-nine, grand and petit juries); *United States* v. *Olson,* 473 F.2d
686, 688 (8th Cir.), cert. denied, 412 U.S. 905 (1973) (persons eighteen to
twenty, petit jury); *United States* v. *Gooding,* 473 F.2d 425, 430 (5th
Cir.), cert. denied, 412 U.S. 928 (1973) (young persons within a three-
year, four-month age range, grand and petit juries); *United States* v. *Ross,*
468 F.2d 1213, 1217 (9th Cir. 1972), cert. denied, 410 U.S. 989 (1973)
(twenty-one to twenty-four age group not cognizable); *United States* v.
*Camara,* 451 F.2d 1122, 1126 (1st Cir. 1971), cert. denied, 405 U.S. 1074
(1972) (persons under twenty-five, grand jury); *United States* v. *Kuhn,*
441 F.2d 179, 181 (5th Cir. 1971) (persons twenty-one to twenty-three,
grand and petit juries); *King* v. *United States,* 346 F.2d 123, 124 (1st Cir.
1965) (persons between twenty-one and twenty-five, grand and petit
juries); *United States* v. *Briggs,* 366 F.Supp. 1356, 1362 (N.D.Fla. 1973)
(persons twenty-one to twenty-nine, grand jury) *United States* v. *Waddy,*
340 F. Supp. 509 (S.D.N.Y. 1971) (persons eighteen to twenty-one, grand
and petit juries); *United States* v. *Guzman,* 337 F. Supp. 140, 145-146
(S.D.N.Y.), aff'd on grounds that exclusion not systematic, 468 F.2d 1245
(2d Cir. 1972), cert. denied, 410 U.S. 937 (1973) (persons eighteen to
twenty-one and persons twenty-four to thirty, grand and petit juries);
*United States* v. *Gargan,* 314 F. Supp. 414, 417 (W.D.Wisc. 1970), aff'd
sub nom. *United States* v. *Gast,* 457 F.2d 141 (7th Cir.), cert. denied, 406
U.S. 969 (1972) (persons eighteen to twenty-six, grand jury).

*United States* v. *Butera,* 420 F.2d 564 (1st Cir. 1970), is a "judicial rari-
ty." *Foster* v. *Sparks,* 506 F.2d 805, 824 (5th Cir. 1975). It is the only
Federal case of which we are aware that has stated that an age group is
cognizable for constitutional purposes in a challenge to the composition of
juries. The statement was not essential to the result because the court
held that the government had met its burden of rebutting the defendant's
prima facie case.

Although the Supreme Court of the United States has not answered the question whether jury lists in which younger citizens are excluded or underrepresented are subject to challenge on equal protection or on Sixth Amendment grounds, what it has said may be read as suggesting that a category based on age alone may well not be an "identifiable" or "distinctive" group. In *Hamling* v. *United States*, 418 U.S. 87, 135-138 (1974), the Supreme Court rejected a challenge to a jury selection system which excluded persons under twenty-four years of age through the practice of refilling the jury pool only once every four years from voter registration lists. The Court's opinion does not rest exclusively on constitutional grounds. The Court noted that the plaintiffs cited no Supreme Court authority for the proposition that the young are an identifiable group and that claims of the exclusion of the young from juries have met with little success in the Federal courts. *Id.* at 137.[11] The Court concluded that, assuming that the young were an identifiable group, a prima facie case of discrimination had not been made out because, in the procedure authorized by Congress, there was no "purposeful discrimination" near the end of the four year period. *Id.* at 138. The Court acknowledged the need for "some play in the joints of the jury-selection process" and the appropriateness of considering "practical problems of judicial administration." There was, therefore, no abuse of discretion. This opinion might be read as holding that, under the supervisory role of the Supreme Court (and presumably under constitutional requirements), a statutory provision totally excluding from juries citizens under twenty-four could be acceptable. See *Commonwealth* v. *Core*, 370 Mass. 369, 371-372 n.2 (1976).

---

[11] The Court cited *United States* v. *Gooding*, 473 F.2d 425, 429-430 (5th Cir.), cert. denied, 412 U.S. 928 (1973), *United States* v. *Gast*, 457 F.2d 141, 142 (7th Cir.), cert. denied, 406 U.S. 969 (1972), *United States* v. *Camara*, 451 F.2d 1122, 1126 (1st Cir. 1971), cert. denied, 405 U.S. 1074 (1972), *United States* v. *Kuhn*, 441 F.2d 179, 181 (5th Cir. 1971), and *United States* v. *Butera*, 420 F.2d 564 (1st Cir. 1970).

Thus, we conclude, on the record and findings before us, that classifications based on age alone do not involve identifiable or distinctive groups for Federal constitutional purposes and that the jury lists in Franklin County were not deficient under the Constitution of the United States. Further, as to the equal protection challenge to the composition of the defendant's grand jury, the evidence of what local officials did in seeking to select inhabitants of "good moral character, of sound judgment and free from all legal exceptions" (G. L. c. 234, § 4) shows that there was no intentional discrimination against persons under thirty-five, thus rebutting whatever prima facie case the defendant may be said to have made. As to the Sixth Amendment challenge to the jury lists from which the petit jury was derived, we note that younger people were represented in considerable numbers on the jury lists and that, in the relatively small towns in Franklin County (the entire county had a 1970 population of less than 60,000), the selectmen would be more apt to know, than in larger municipalities, that particular younger people (a) were away at college or graduate school, (b) were in the service, or (c) were employed elsewhere while maintaining places of residence with their parents.[12] In a system that is designed to produce people who will be

---

[12] Although the judge made no subsidiary findings of fact concerning the distribution of age groups either within Franklin County or on the jury lists from which the defendant's grand and petit juries were derived, we can tell from the exhibits introduced by the defendant, and challenged by the Commonwealth only in minor respects, that (based on the 1970 Federal census) persons eighteen to twenty, inclusive, represented about 8% of the county's population between ages eighteen and seventy, inclusive, but less than 1% of the people on the jury lists. We note further that the age group thirty to thirty-four comprised 2,725 of the approximately 34,680 people between the ages of eighteen and seventy, inclusive, or 8% of the total, and that that age group's representation on the jury lists ranged, in the relevant years, from 5.8% of the total in the eligible age group (eighteen to seventy) to 10.7%. There is, therefore, a substantial question whether there was any underrepresentation at all of the thirty to thirty-four age group. The evidence further shows that the twenty-one to twenty-four age group was underrepresented to a greater degree than was the twenty-five to twenty-nine age group.

able to serve as jurors, such practical considerations need not be entirely ignored. The procedures followed in the "key man" system considered in *United States* v. *Butera*, 420 F.2d 564 (1st Cir. 1970), were not substantively different from those followed in Franklin County, produced a greater underrepresentation of younger people than exists in this case (see *id.* at 569 n.12), and yet were held to be adequate to dispel the inference of the defendant's prima facie case in an analysis which included Sixth Amendment considerations. The court was satisfied that the persons recommended as potential jurors were selected in a nondiscriminatory manner.

Because the defendant raised in this court for the first time a claim that there was a violation of art. 12 of the Declaration of Rights, we need not pass on the argument. We note, however, that the defendant has not shown that he has been denied "the judgment of his peers." We have expressed particular sensitivity in analyzing jury selection practices to discrimination against those groupings in the community that are set out in art. 1 of the Declaration of Rights, as amended by art. 106 ("sex, race, color, creed or national origin"). See *Commonwealth* v. *Soares*, 377 Mass. 461, 486-489, cert. denied, 444 U.S. 881 (1979). As to groups described in art. 1, we would not be concerned solely with whether the discrimination was intentional because even unintentional discrimination against such a group would raise a constitutional question. In the *Soares* case, the apparent discrimination was against blacks and was arguably intentional. Also, the defendants were black and the victims white, thus raising the real possibility that prejudice might result from the exclusion of blacks from the jury. In the case before us, however, there is no group described in art. 1, and there is a demonstrated absence of any intentional discrimination against younger people. Moreover, on the facts of the case, there was no tension based on differences in age between defendant and victim.

Surely, considering the role and operation of grand juries (see *Brunson* v. *Commonwealth*, 369 Mass. 106, 120

[1975]), there is no basis for concluding that the decision to indict the defendant would have been affected by a greater, representative number of younger citizens on the various jury lists. Moreover, we see no State constitutional basis demonstrated in this case for successfully challenging the petit jury because of the alleged underrepresentation on jury lists of the age group between eighteen and thirty-five. We would, however, view differently a substantial, identified exclusion of any distinct, qualified segment of society from jury lists, whether or not the exclusion was intentional.

Our concern with the composition of jury lists, and of grand and petit juries derived from those lists, does not end with a determination that statutory and constitutional requirements have been satisfied in this case. This court has both a constitutional and a statutory (G. L. c. 211, § 3) obligation to oversee the administration of justice in our courts. In matters concerned with the administration of the courts and the trial of cases, we may impose requirements (by order, rule or opinion) that go beyond constitutional mandates. We think the able presentation by defense counsel has brought forcefully to our attention certain undesirable consequences of the procedures by which jury lists have been prepared in most towns in Franklin County. We suspect that some or all of these problems may exist in other counties in the Commonwealth.[13] The "key man" system contains the possibility of abuse. Only a decreasing minority of States use it in one form or another. See J.M. Van Dyke, Jury Selection Procedures 86-87 (1977). Congress abandoned the system in 1968 in favor of a random selection process. 28 U.S.C. § 1861 et seq. (1976).[14]

---

[13] These problems would not exist in Middlesex County (see G. L. c. 234A) and perhaps not in Boston in Suffolk County (see *Brunson* v. *Commonwealth*, 369 Mass. 106, 115 [1975]).

[14] It seems likely that, in its opinion in the *Butera* case, the Court of Appeals for the First Circuit would have used its supervisory power to direct changes in the Federal jury systems under its authority had Con-

There is much to be said for the compilation of jury lists by a random process, one which allows for the exemption of persons defined by statute, but otherwise eliminates the consequences of selections based on subjective considerations. We now know that the collective effect of the system used in Franklin County to compile jury lists has been to underrepresent younger persons. While this result is not a ground for reversing a conviction, there is no good reason to permit underrepresentation of any age group to continue, except as it might be the natural consequence of random selection, together with valid statutory exemptions. The use of random selection processes in the compilation of jury lists in the various cities and towns in the Commonwealth should increase confidence in the jury system, enhance the appearance of fairness, and distribute more evenly the civic responsibility to serve on juries.

We, therefore, ask the Attorney General of the Commonwealth, with the assistance of others of his own choosing, to prescribe procedures for the compilation of jury lists in those cities and towns that are not now using a substantially random selection process. In some instances, it may be appropriate to suggest that jury lists be completely reconstituted as soon as is practicable. In other cases, change in present practices may fairly take place as new annual recompilations of jury lists are made. Of course, the Legislature may determine to expand the principles of the Middlesex County jury system, or some modification of it, to other counties in the Commonwealth. In any event, prompt attention should be given to this matter. After the passage of a reasonable time, judges of the Commonwealth should look with favor on proven claims that the jury lists from which grand and particularly petit jurors are derived were not compiled by a substantially random process, subject, of course, to appropriate statutory exemptions.

gress not already altered the Federal jury selection procedure. See *United States* v. *Butera*, 420 F.2d 564, 574 (1st Cir. 1970). See also *New Jersey* v. *Rochester*, 54 N.J. 85, 92 (1969), where selection of grand jurors at random (as was the case already for petit jurors) was directed by judicial order.

2. As we noted at the commencement of this opinion, the defendant's conviction must be reversed.

We need not summarize the facts fully in order to set forth the bases for the defendant's various arguments. For a fuller recitation of the facts see *Commonwealth* v. *Bastarache*, 10 Mass. App. Ct. 499, 500-503 (1980). It is sufficient to note that, after an argument in the V.F.W. club in Turners Falls one afternoon in May, 1978, the defendant and the victim went out the back door of the club. The defendant testified that, when the victim grabbed him by the hair, he retaliated with his fists. The victim fell to the ground and was seriously injured. He died in a hospital four days later. After the altercation, the defendant reentered the club, told a woman that the victim was out back, and left by the front door. Experts differed on whether the victim's death was caused by blunt force injuries or possibly, in whole or in part, by reason of his alcoholism. A test for the victim's blood alcohol content, made shortly after his arrival at a hospital, showed a reading of .354, a level, according to testimony, close to that capable of causing death.

a. Over the defendant's objection, the judge charged the jury, several times in various ways, that, if the defendant wantonly and recklessly had abandoned the victim on the ground, without taking reasonable steps to obtain medical assistance, a finding of involuntary manslaughter would be warranted. We agree with the defendant that there was no evidence that any delay, attributable to the defendant, in providing medical attention was a cause of the victim's death. Thus, no charge should have been given based on the theory of wanton and reckless conduct in leaving the defendant on the ground outside the V.F.W. club.

b. On the question whether the defendant acted wantonly and recklessly, the judge also charged the jury that the defendant could not claim that he acted in self-defense if he knew or should have known that the victim was drunk and susceptible to injury. Although the victim's known actual or apparent condition was a factor to consider in deciding

whether the defendant acted reasonably in defense of himself or acted wantonly and recklessly, the defendant's claim of self-defense would not have been foreclosed by a finding that the defendant knew or should have known that the victim was drunk and susceptible to injury. If the defendant used all proper means to avoid physical combat, he could use appropriate and adequate nondeadly force to protect himself, even from a drunk susceptible to injury, if he reasonably believed that his personal safety or life was in peril. See *Commonwealth* v. *DeCaro*, 359 Mass. 388, 389-390 (1971). The right reasonably to use a nondeadly force, such as one's fists, in self-defense, arises at a somewhat lower level of danger (a reasonable concern for personal safety) than the right to use a dangerous weapon. See *Commonwealth* v. *Houston*, 332 Mass. 687, 690 (1955) (deadly force may be used only where the person has "a reasonable apprehension of great bodily harm and a reasonable belief that no other means would suffice to prevent such harm").[15]

c. We agree with the Appeals Court that the autopsy photographs of the victim's brain and of the interior of his

---

[15] *Commonwealth* v. *DeCaro*, 359 Mass. 388 (1971), involved a death caused by a blow. The judge charged the jury that the defendant would have been warranted in using force to protect himself if he reasonably thought his *personal safety* or life was in peril. We said the charge was "correct." *Commonwealth* v. *DeCaro, supra* at 389. But the defendant did not challenge the charge on the ground that concern over personal safety was not the appropriate standard, and the charge may have been more favorable to the defendant than it had to be. In *Commonwealth* v. *Peterson*, 257 Mass. 473, 478 (1926), another case of nondeadly force causing death, the court stated, in what is also a dictum, that a "defendant cannot give blow for blow and justify homicide in self defense" unless the victim "had a felonious intent to injure the defendant" or "the defendant had reasonable grounds to fear danger to his life or *serious bodily injury*" (emphasis supplied). In this opinion, we make the choice in favor of reasonable concern over one's personal safety as the proper standard when nondeadly force is used. This standard applies equally to an assault and battery charge and to a manslaughter or murder charge.

It must be recalled that in all self-defense claims the right does not arise until the defendant has availed himself of all proper means to avoid physical combat. *Commonwealth* v. *DeCaro, supra* at 390.

skull after the brain was removed were inflammatory, graphic, and grisly. *Commonwealth* v. *Bastarache*, 10 Mass. App. Ct. 499, 510 (1980). We do not agree, however, that the photographs lacked relevance. They supported the Commonwealth's theory of the cause of the victim's death. As a general rule, a judge may admit relevant evidence even if a party has agreed to stipulate to the fact that the offered evidence tends to prove.

We have left the matter of the admissibility of photographs almost entirely to the discretion of the trial judge. Rarely have we reversed a conviction because of the introduction of photographs of the victim. See *Commonwealth* v. *Richmond*, 371 Mass. 563, 564 (1976); *Commonwealth* v. *Bys*, 370 Mass. 350, 360 (1976). Autopsy photographs of the type involved here may present special problems. In this case on retrial, and in future cases involving photographs showing the body as altered in the course of an autopsy, the judge should carefully assess the photographs. If they are apt to be inflammatory or otherwise prejudicial, he should admit them, in his discretion, only if they are important to the resolution of any contested fact in the case. In some instances, an expert may testify and be cross-examined concerning autopsy photographs without any need to show them to the jury. Unless the viewing of an autopsy photograph would aid the jury, as lay people, in making a finding of fact on a contested point, the actual viewing of a photograph showing the body as altered in the course of an autopsy would serve no proper purpose. It may often be difficult to determine the admissibility of such photographs before any expert testifies, and a decision to exclude such photographs might properly be changed during or after the testimony of one or more experts. The exercise of discretion to admit such photographs should be based in part on an assessment of the contested issues of fact. Compare *Commonwealth* v. *Cadwell*, 374 Mass. 308, 314-315 (1978), with *Commonwealth* v. *Richmond, supra* at 565.

d. We deal briefly with the defendant's other contentions. (i) There was no error in the denial of the defendant's

motion for a directed verdict at the close of the Commonwealth's case. (ii) The better course is to keep from the jury any statement on a death certificate that the cause of death was "homicide." See *Commonwealth* v. *Lannon,* 364 Mass. 480, 482 (1974). Testimony of the medical examiner, reading the words "probable homicide" from the death certificate, preferably should have been forestalled, as the defendant urged. We note, however, that the death certificate itself was introduced by agreement. (iii) There was little evidence warranting an instruction that flight could be an "admission of guilt." The defendant's actions (in returning to the V.F.W. and saying where the victim was, in telling a person outside the V.F.W. that he injured someone, and in calling the police several hours later) tend to negate any basis for a claim of flight. (iv) In charging the jury at any retrial as to whether the defendant's conduct was a cause of the victim's death so as to permit a finding of guilt, we would expect the judge to reflect the views expressed in *Commonwealth* v. *Rhoades,* 379 Mass. 810, 823 n.12, 825 (1980). The fact that the victim's alcoholism may have contributed to his death would not bar a finding that the defendant's unlawful acts caused that death.

*Judgment of the Superior Court reversed.*

*Verdict set aside.*